United States District Court
Southern District of Texas
**ENTERED**
March 26, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

LANDMARK AMERICAN INSURANCE §
COMPANY, §
§
    Plaintiff, §
§
VS. §    CIVIL ACTION NO. 2:19-CV-00006
§
PORT ROYAL BY THE SEA §
CONDOMINIUM OWNERS §
ASSOCIATION, INC., §
§
    Defendant. §

## MEMORANDUM AND RECOMMENDATION

Plaintiff Landmark American Insurance Company ("Landmark") filed suit in January 2019 against Defendant Port Royal by the Sea Condominium Owners Association, Inc. ("Port Royal"). (D.E. 1). Port Royal subsequently filed a counterclaim, later amended, against Landmark, to which Landmark has answered.[1] (D.E. 120, 126). Now pending are various motions for summary judgment, including: (1) Port Royal's "Motion for Partial Summary Judgment on Plaintiff/Counter-Defendant's First and Seventeenth Affirmative

---

[1] Port Royal also brought counterclaims against third-party administrator and insurance adjustment company Engle Martin & Associates ("Engle Martin") and independent adjuster David A. Alvarez, but these parties have since been dismissed. (D.E. 257).

Defenses"[2] (D.E. 143); (2) Landmark's "Motion for Summary Judgment on Port Royal's Failure to Allocate Causation and Damages" (D.E. 146); (3) Landmark's "Motion for Summary Judgment on Port Royal's Building Two Claims" (D.E. 147); (4) Landmark's "Motion for Summary Judgment on Port Royal's Business Income (and Extra Expense) Claims" (D.E. 148); and (5) Landmark's "Motion for Summary Judgment on Port Royal's Extracontractual Counterclaims" (D.E. 149). Also pending is Landmark's "Objections to and Motion to Strike Port Royal's Summary Judgment Evidence" (D.E. 208), along with the responses, replies, and supplemental authorities related to these six motions (D.E. 191, 192, 197, 198, 207, 209, 210, 211, 214, 215, 218, 219, 229, 230, 233, 235, 238, 239, 251, 256).

For the reasons discussed further below, it is recommended that: (1) Landmark's motion to strike (D.E. 208) be **GRANTED in part and DENIED in part**; (2) Port Royal's motion for partial summary judgment (D.E. 143) be **DENIED**; (3) Landmark's motion for summary judgment on Port Royal's failure to allocate (D.E. 146) be **DENIED**; (4) Landmark's motion for summary judgment on Port Royal's Building 2 claims (D.E. 147) be **GRANTED**; (5) Landmark's motion for summary judgment on Port Royal's business income claims (D.E. 148) be **GRANTED**; and (6) Landmark's motion for summary judgment on Port Royal's extracontractual claims (D.E. 149) be **GRANTED**.

---

[2] Although Port Royal purports to challenge the first and seventeenth affirmative defenses, this citation appears to be to Landmark's original answer in D.E. 22. (*See* D.E. 143 at 4). The equivalent defenses in the controlling First Amended Answer are the second and twenty-first affirmative defenses. (D.E. 126 at 9, 39).

# I.   PLEADINGS

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is appropriate because Thomas was convicted in Kleberg County, Texas.  28 U.S.C. § 2254(a); 28 U.S.C. § 124(b)(6); *Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000).

### a.   Landmark's Complaint

Landmark alleges the following in its complaint.  (D.E. 1).  Port Royal is the named insured under a commercial property policy issued by Landmark.  (*Id.* at 2).  This policy was in effect between August 31, 2016, and August 31, 2017, and provided coverage for three of the five condominium buildings on Port Royal's property.  Port Royal made an insurance claim following damage caused by Hurricane Harvey on August 25, 2017.  (*Id.*).  The policy covered only damage caused by the windstorm, not damage caused by flooding.  (*Id.* at 3).  On November 21, 2018, Port Royal sent Landmark a Sworn Statement in Proof of Loss of $23,571,298.82, and further requested an advance of $2,000,000 for the building portion of the loss.  (*Id.* at 4).  However, the report that Port Royal relied on to reach its estimates did not indicate that all categories of damage were caused by Hurricane Harvey.  Accordingly, Landmark rejected the Proof of Loss and did not advance any funds.  At the time of the complaint, Landmark had issued claim payments to Port Royal of $9,375,678.57, and the Texas Windstorm Insurance Association ("TWIA") had issued claim payments of $13,272,000, for a total of $22,647,678.57 for Hurricane Harvey damage.  (*Id.*).

Landmark seeks a declaratory judgment either stating that it has paid Port Royal for all covered damages owed for the loss or indicating the extent to which further payment is

owed.  (*Id.* at 5).  Specifically, Landmark seeks a declaration resolving the following issues: (1) whether claimed losses for 2018 rainstorms constitute separate occurrences that have separate deductibles under the policy; (2) whether the policy excludes coverage for damage not commencing between August 31, 2016, and August 31, 2017; (3) whether the policy excludes damage that existed before Hurricane Harvey; (4) whether Port Royal may recover business income and extra expense coverage for costs associated with building a temporary restaurant building when it had made no efforts to repair the original restaurant building; (5) whether the policy excludes building coverage for the restaurant because it was damaged by a named storm; (6) whether the policy excludes damage to the property caused by wind-driven rain that cannot be linked to nearby damage to the roof or walls; (7) whether the policy excludes coverage for damage caused by Port Royal, its consultants, or its contractors; and (8) whether Landmark has paid Port Royal for all covered damages or the extent to which further payment is owed.  (*Id.* at 5-6, 27-28).[3]  Landmark also seeks attorney's fees and costs.  (*Id.* at 29).

> b.   *Port Royal's Counterclaims*

In its second amended counterclaim, Port Royal alleges that Landmark acknowledged that their property was damaged by Hurricane Harvey, but Landmark has paid only a portion of the money due under the terms of the insurance policy.  (D.E. 120 at

---

[3] Landmark's complaint also includes excerpts of the relevant parts of the insurance policy.  (D.E. 1 at 6-27).  Rather than summarizing all of these sections, this memorandum will summarize the policy provisions relevant to each pending motion below.

2).   Port Royal does not dispute Landmark's summary of the basic facts of the case, including the limits of the policy and the claimed loss totals.   (*Id.* at 2-3).

Port Royal further alleges the following.   It sustained a physical loss or damage as a result of Hurricane Harvey's winds.   (*Id.* at 4).   The Landmark insurance policy was in effect at the time of the damage, and all damages and losses were caused by a peril covered by the policy.   (*Id.*).   Port Royal timely reported its claim for these damages, which included major damage to roofs, blown out walls and windows, missing and displaced walls, exterior building damage to walls and windows, interior damage to the buildings caused by wind and rain entering through the damaged roofs and walls, and business interruption and extra expense claims resulting from the damage.   (*Id.* at 4-5).   The property was not subject to general flooding and all damage was related to the wind.   (*Id.* at 5).   Alvarez inspected the property on behalf of Landmark and Engle Martin, but ultimately took the position that Port Royal was making false claims, that the property damage was caused by flooding rather than wind, that contractors had removed too much unidentified debris from the property, and that Port Royal failed to mitigate its loss and damages.   Alvarez knowingly and intentionally failed to properly investigate Port Royal's claim by failing to communicate with TWIA's adjusters, who had determined that Building 2 was a total loss. (*Id.*).   Alvarez also ignored determinations of wind-related loss by TWIA.   (*Id.* at 6).

Port Royal engaged the assistance of a damage consultant and engineering experts to aid in estimating the reasonable costs of repair and evaluating the cause of the damage, by Alvarez failed to communicate with any of these consultants and engineers.   (*Id.*)   He instead continued to accuse Port Royal of attempting to obtain policy funds to make pre-

planned upgrades to its property. Port Royal cooperated with the terms and conditions of the policy and replaced damaged HVAC systems as soon as reasonably possible to mitigate damages. (*Id.*). Even though one of Landmark's engineering experts verified that there was wall displacement to the buildings, Alvarez maintained that there was no wall displacement. (*Id.* at 6-7). Landmark knowingly and intentionally engaged unskilled or outcome-oriented adjusters, consultants, and experts in an effort to avoid investigating and paying Port Royal's claim. (*Id.* at 7). They continually argued against best practices of repair and/or replacement and pricing, even when presented with invoices for completed work. Alvarez refused to adequately adjust Port Royal's claim by arguing that Port Royal's consultant's pricing did not comply with industry standards, even though the consultant offered to let Alvarez review the pricing means book used for the estimate. Alvarez instead insisted on using his own pricing and ignored actual bids obtained for repairs. He also refused to acknowledge any damage caused by wind and water intrusion through openings in the roof and walls caused by Hurricane Harvey's wind. (*Id.*). He also would not discuss damages to other buildings, even though Port Royal promptly submitted such claims. (*Id.* at 7-8).

Landmark arbitrarily determined that Port Royal had not suffered a covered business income or extra expense loss, but never fully or substantially presented the denial of that claim to Port Royal. (*Id.* at 8). In sum, Landmark engaged in an investigation that was clearly designed to avoid liability. On November 21, 2018, Port Royal submitted a Sworn Proof of Loss and supporting documents for wind-related damages caused by Hurricane Harvey, but Landmark rejected the Proof of Loss. (*Id.*). Rather than adhere to its

6

contractual obligations and notify Port Royal of the basis for delaying or denying insurance proceeds through specific citations to the policy provisions, Landmark instead breached the contract and filed this lawsuit, resulting in additional expenses for Port Royal. (*Id.* at 8-9).

Port Royal raises five specific claims against Landmark. First, Port Royal contends that Landmark breached the insurance contract by: (a) refusing to pay the full amounts due; and (b) failing to properly investigate, evaluate, adjust, and pay Port Royal's claims under the contract. (*Id.* at 11-12). Second, Port Royal asserts that Landmark violated the Texas Unfair Methods of Competition and Unfair or Deceptive Acts or Practices Act by refusing to pay a claim without conducting a reasonable investigation with respect to the claim. (*Id.* at 13-14). Third, Port Royal contends that Landmark failed to comply with Chapter 452 of the Texas Insurance Code regarding the prompt payment of claims. (*Id.* at 14-15). Fourth, Port Royal asserts that Landmark violated the Texas Deceptive Trade Practices Act ("DTPA") in various ways, including refusing to pay benefits due under the insurance contract despite accepting insurance premiums. (*Id.* at 15-17). Finally, Port Royal contends that Landmark breached the common law implied covenant of good faith and fair dealing by failing to reasonably investigate, evaluate, and pay the benefits owed under the insurance contract, despite knowing that liability was reasonably clear. (*Id.* at 17-18).

      *c.   Landmark's Answer and Affirmative Defenses*

Landmark denies all of Port Royal's allegations specific to their counterclaims. (D.E. 126 at 6-9). Landmark also submitted various affirmative and alternative defenses,

but rather than summarizing all of these defenses, this memorandum will address below any defenses relevant to each pending motion.  (*Id.* at 9-40).

## II.  LANDMARK'S MOTION TO STRIKE PORT ROYAL'S SUMMARY JUDGMENT EVIDENCE (D.E. 208)

In its motion, Landmark contends that this Court must strike new expert affidavits by Don Lamont, David Day, Bruce Smith, Steven Spencer, and Ron Wheaton that Port Royal filed in response to the motions for summary judgment. (D.E. 208).  First, Landmark contends that all the affidavits are untimely because they contain new expert opinions that were submitted after the relevant disclosure deadlines.  (*Id.* at 6).  Second, Landmark asserts that the affidavits from Lamont, Day, and Spencer should be stricken under the sham affidavit rule because their new statements are inconsistent with their prior deposition testimony.  (*Id.* at 7-10).  Specifically, Landmark contests any new statements regarding segregation of damages between covered and non-covered perils, contending that the prior deposition testimony clearly showed that none of these witnesses segregated damages. (*Id.*).  Finally, Landmark argues that the new affidavits are not competent summary judgment evidence because they present only conclusory opinions with no discernible methodology.  (*Id.* at 11-12).

Port Royal responds by addressing each challenged expert individually.  (D.E. 214). First, as to Lamont, Port Royal contends that his affidavit is consistent with his previous report and testimony because he was hired to write an estimate of covered damages caused by Hurricane Harvey, and therefore all of his materials left out uncovered damages. (*Id.* at 5-8).  Second, Port Royal asserts that Day inspected the property both before and after

Hurricane Harvey and that all damage discussed in his expert report was deemed to be caused by the hurricane. (*Id.* at 9-12). Third, Port Royal argues that Smith was designated to testify about business income loss and that his affidavit is consistent with and supplements his earlier deposition testimony. (*Id.* at 12-13). Fourth, Port Royal contends that Spencer focused on the exterior damage to the buildings caused by Hurricane Harvey and that his new affidavit is consistent with his expert report. (*Id.* at 13-14). Finally, Port Royal contends that Wheaton can testify as a fact witness with expert knowledge because he inspected HVAC machinery at the property prior to the hurricane and worked on the remediation efforts after the hurricane. (*Id.* at 14-15).

Landmark first replies that Port Royal never designated Wheaton as a fact witness with expert knowledge, even though other witnesses were designated as such. (D.E. 18 at 1-2). Landmark contends that Port Royal's failure to make the necessary designations precludes Wheaton from providing expert opinions in this case. (*Id.*). Next, Landmark reiterates that the court should disregard the new affidavits in their entirety because they contain new opinions submitted after the disclosure deadline. (*Id.* at 3-4). Further, Landmark argues that all the affidavits are not competent evidence because they only identify covered damages without addressing non-covered damages, which is insufficient under Texas law. (*Id.* at 4-6). Finally, Landmark contends that the entirety of these new affidavits is objectionable, and that their existence indicates that Port Royal's experts did not previously allocate between covered and noncovered damages. (*Id.* at 6-7).

In a sur-reply, Port Royal reiterates that the affidavits are consistent with the prior reports and deposition testimony and that the witnesses properly segregated damages such

that there is a reasonable basis for the jury to allocate the damage.  (D.E. 229 at 1-4).  Both parties have also filed supplemental authorities and related briefing.  (D.E. 230, 233, 235, 238, 239).

>    a.    *Applicable Law*

A party objecting to submitted evidence must make specific objections detailing the specific evidence that they seek to have stricken and stating the specific grounds upon which each piece of evidence should be stricken.  Fed. R. Evid. 103(a)(1).

At the summary judgment stage, a party may meet their burden to demonstrate that a genuine issue of material fact exists by relying on any form of evidence listed in Federal Rule of Civil Procedure 56(c).  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  Thus, affidavits are sufficient to defeat a motion for summary judgment, but the contents of an affidavit must still meet evidentiary requirements, such as hearsay rules.  *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997).  However, courts do not typically rely on information in an expert's affidavit, unless it is consistent with the expert's deposition testimony and does not add significant new opinions.  *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, No. 3:16-CV-2255-L, 2019 WL 1436659 at *13 n.4 (N.D. Tex. Mar. 31, 2019).

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if: (1) their scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the

principles and methods to the facts of the case.  Fed. R. Evid. 702.  Expert witnesses who are retained or specially employed to provide expert testimony must provide a written report that contains: (1) a complete statement of all opinions the witness will express and the basis and reasons for them; and (2) the facts and data considered by the witness in forming them, among other things.  Fed. R. Civ. P. 26(a)(2)(B).  Expert reports must be "detailed and complete."  Fed. R. Civ. P. 26 Advisory Committee's note; *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996).  Thus, expert reports must not be sketchy, vague, or preliminary in nature, and disclosures may not be used as a means to extend the discovery deadline.  *Id.*

Witnesses who have expert knowledge and who have personally observed transactions or occurrences that are part of the lawsuit must be treated as ordinary witnesses under Rule 26.  *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 552 (5th Cir. 2000).  "[E]xpert witnesses who were involved in the events leading up to litigation and may testify as both an expert and as a fact witness" need not provide a written report, but the party must nonetheless disclose the subject-matter on which the witness may testify as an expert and a summary of the facts and opinions to which the witness is expected to testify.  *LaShip, L.L.C. v. Hayward Baker, Inc.*, 680 F. App'x 317, 324 (5th Cir. 2017); Fed. R. Civ. P. 26(a)(2)(C).

If a party fails to provide information as required under Rule 26, they are not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless.  Fed. R. Civ. P. 37(c).

Additionally, the court may strike the pleadings in whole or in part. Fed. R. Civ. P. 37(b)(2)(A)(iii), (c)(1)(C).

A party may supplement an expert report if they later learn that the report was incomplete or incorrect, and any such additions or changes must be disclosed by the time the party's pretrial disclosures are due. Fed. R. Civ. P. 26(e). However, supplemental "disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club*, 73 F.3d at 571. Accordingly, supplemental disclosures are permissible to the extent that they correct inaccuracies from the original report or fill in information that was not available at the time of the initial disclosure. *Diaz v. Con-Way Truckload, Inc.*, 279 F.R.D. 412, 421 (S.D. Tex. 2012). A subsequent expert affidavit submitted to rebut a summary judgment motion may be excluded if it differs from an earlier Rule 26 report. *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603 (S.D. Tex. 2001).

The sham affidavit doctrine prevents a party who has been deposed from introducing an affidavit that contradicts that person's deposition testimony without explanation because "a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). Not every discrepancy results in the exclusion of the affidavit, and slightly inconsistent affidavits can explain certain aspects of a party's deposition testimony. *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980). Where a party changes their testimony, they must provide some explanation. *Free v. Wal-Mart Louisiana, L.L.C.*, 815 F. App'x 765, 766 (5th Cir. 2020). "When an affidavit merely

supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996). An affidavit properly supplements deposition testimony when it clarifies facts by giving greater detail or additional facts not provided in the deposition. *Id.*

When covered and noncovered perils combine to cause an injury to an insured's property, the insured must present evidence that would provide the jury a reasonable basis to allocate the damage. *Starco Impex, Inc. v. Landmark Am. Ins. Co.*, No. 1:19-CV-39, 2020 WL 3442842, at *5 (E.D. Tex. June 3, 2020), report and recommendation adopted, No. 1:19-CV-39, 2020 WL 3440575 (E.D. Tex. June 23, 2020).

b. *Lamont*

Port Royal designated Lamont as a fact witness with potential expert testimony who would testify "regarding the cause and extent of damages as well as costs to repair the damages" based on his own inspection of the property. (D.E. 145-7 at 5). Lamont's complete estimates are available in the record. (*See* D.E. 154-4 through 154-11). These estimates separate repair costs by building and category, determine a cost for each particular item, and apply depreciation where appropriate to reach the actual cost value. (*See id.*).

In his October 2020 deposition, Lamont testified to the following. (D.E. 145-20). Hurricane Harvey damaged Port Royal's property and his estimates included what he thought was a reasonable cost to repair or replace the covered portions of that damage. (*Id.* at 125). However, he had not been designated to testify about either the concurrent

13

causation doctrine or the difference between covered versus non-covered perils.  (*Id.* at 129).  Lamont disagreed that his estimates for the windows did not include an allocation analysis regarding their preexisting condition prior to Hurricane Harvey, noting that he had applied depreciation due to the age and use of the windows.  (*Id.* at 151).  When he inspected the property, he saw some existing issues like spalling concrete, which was never in his estimates.  (*Id.* at 193).  There were subsequent water leaks that damaged interior walls, but those expenses were not included in his estimates.  (*Id.* at 199-200).  It was possible that some of his estimates regarding mechanical, electrical, and plumbing ("MEP") expenses included elective or betterment expenses because he had to rely on estimates by others for those issues.  (*Id.* at 205-06).  However, his estimates were closer to the actual policy coverage than the repair invoices submitted by contractors.  (*Id.* at 236-37).  His roofing estimate included the standing seam roof installed after Hurricane Harvey rather than the R-panel roof installed prior to the hurricane.  (*Id.* at 244).

Lamont further testified that 100% of the damage to the elevators was caused by water coming in from the roof rather than by flooding from a storm surge.  (*Id.* at 253).  His estimates for repairs to the air conditioners and lighting was based almost entirely on the invoice provided by Wheaton.  (*Id.* at 257).  However, Lamont did not see any major upgrades to these systems.  (*Id.* at 258).  Lamont was aware that the policy did not cover the replacement of Exterior Insulation Finishing System ("EIFS") on some types of surfaces, but that exclusion was inapplicable at Port Royal because EIFS was only installed on concrete.  (*Id.* at 281-82).  Lamont did not agree with the statement that his estimates included costs not covered by the policy.  (*Id.* at 290).  He needed to investigate whether

14

his estimates included the costs for an upgraded roof. (*Id.* at 291). Regardless of existing damage, if the property also suffered damage from a hurricane, the policy covered that damage. (*Id.* at 291-92). Port Royal never made a claim for any preexisting damage, only for damage caused by Hurricane Harvey. (*Id.* at 293). All of the MEP items were covered by the policy, although they may have exceeded the limit for code upgrades. (*Id.* at 297). It would cost more to repair portions of the EIFS than it would to replace it entirely. (*Id.* at 297-98). Any preexisting damage to the roof was irrelevant because the entire roof needed to be replaced as a result of the storm damage, and the insurance company's adjusters reached the same conclusion. (*Id.* at 300-02). Depreciation accounted for any damage caused by the age of the roof. (*Id.* at 302).

In a July 2021 affidavit, Lamont stated that his estimates for the scope of repair of the interior of the units included only damage caused directly by Hurricane Harvey. (D.E. 189-8 at 4). The estimate did not include any damage to the walls from subsequent rainstorms. (*Id.*). Similarly, his estimates for the cost of remediation were consistent with the actual costs charged immediately following Hurricane Harvey and did not include any additional costs for subsequent rainstorms. (*Id.* at 4-5). As to roof damage, Lamont's estimates only included the cost to replace the metal PBR panel roof, which is what was on the buildings at the time of the hurricane. (*Id.* at 5). The estimates did not include the costs for the improved roof that was actually installed or any amount for code upgrades such as added insulation in the attics. (*Id.*). Lamont's estimates used depreciation to arrive at the actual cash value, as required by the policy. (*Id.* at 5-6). As to the exterior walls, Lamont's estimates included repair of all walls using the same finishes as existed prior to

15

the hurricane. (*Id.* at 6). To the extent the policy limited coverage for EIFS on certain types of walls, that exclusion was inapplicable because the EIFS at Port Royal was only installed on concrete. (*Id.*). The windows in Lamont's estimates did not include code upgrades. (*Id.* at 7). The actual quote to replace the windows and exterior doors that Port Royal received was significantly higher than Lamont's estimates, specifically because the actual estimate included code upgraded materials. (*Id.*). Finally, as to MEP expenses, Lamont's estimates on Buildings 3 and 6 included only the cost of new condensers and excluded the cost of new air handlers, new condenser lines, and new ductwork. (*Id.* at 7-8). For Building 2, Lamont's estimate included the entire cost quoted by Wheaton Engineering because the building was a total loss due to the hurricane and had been gutted. (*Id.* at 8).

Here, Lamont's new affidavit is supplementary to his prior estimates and his deposition testimony. Lamont's estimates comprehensively laid out how he reached his cost estimates for each building. (*See* D.E. 154-4 through 154-11). However, while the estimates include standard depreciation calculations, they do not otherwise explain what Lamont excluded as non-covered, if anything. (*See id.*). During his deposition, Lamont testified that: (1) his estimates included what he thought was a reasonable cost to repair or replace the *covered* damage; (2) he saw some preexisting issues at the property that were not included in his estimates; (3) no water damage that occurred after Hurricane Harvey was included in his estimates; (4) his estimates did not include costs not covered by the policy; (5) he needed to investigate whether his estimates included costs for an upgraded roof; and (6) Port Royal did not make a claim for any preexisting damage. (D.E. 145-20

16

at 125, 193, 199-200, 290-91, 293).  His new affidavit is consistent with and supplements both his testimony and his estimates by describing what was and was not included.  In his affidavit, Lamont never claims to be changing or revising his estimates, he merely explains what those estimates included.  (D.E. 189-8).  Because the new affidavit did not alter Lamont's prior estimates and deposition, but rather added further explanation to them, it was neither untimely nor a sham.  Notably, Lamont was designated as a fact witness with potential expert testimony who could testify regarding "the cause and extent of damages," so the fact that he may testify regarding these issues was known at the time of the deposition.  (D.E. 145-7).

As to competency, the affidavit is not merely conclusory.  Lamont personally inspected the property, took photographs, and performed moisture tests.  (D.E. 189-8 at 3).  He also met with contractors working on the repairs to the property and reviewed all engineering reports.  (*Id.* at 3-4).  He noted, for example, that all interior repairs were due solely to damage caused by Hurricane Harvey because nearly all the work included in his estimates was completed before the later rainstorms.  (*Id.* at 5).  Similarly, he explains that his estimate for the roof repairs could not have included any code additions because the estimate did not include the required new insulation.  (*Id.*).  When considered in context with both his estimates and his deposition testimony, Lamont's affidavit is not merely conclusory.

The new affidavit is supplementary to Lamont's estimates and deposition testimony, not contradictory or entirely new.  Accordingly, it is recommended that Landmark's motion (D.E. 208) be **DENIED** as to Lamont's affidavit.

17

c.   *Day*

Port Royal designated Day as a retained expert who would testify "regarding the cause and origin of the hurricane damage to the insured property." (D.E. 145-7 at 4).

In a September 2017 report, Day stated the following. (D.E. 214-1). Buildings 3 and 6 suffered broken windows, displaced walls, impact damage, damaged and loose air conditioning units, and other damage. (*Id.* at 1-2). The roofs on both buildings had also lifted at the edges, and any loose roof panels were caused by Hurricane Harvey. (*Id.*). Building 2 suffered impact damage and the roof was completely displaced on the west side. (*Id.* at 2). Water traveled from the third floor to the first floor and saturated everything in between. (*Id.*). Day recommended: (1) replacing all damaged components and framing members; (2) complete re-roofs on Buildings 2, 3, and 6; (3) replacement of purlins that were corroded prior to Hurricane Harvey; (4) replacement of all broken windows; (5) re-building of damaged curtain walls on Buildings 2 and 3; (6) repair of damaged EIFS; and (7) removal and replacement of damaged stucco, among other repairs. (*Id.* at 3).

In an October 2017 report, Day stated that he had inspected two units after the removal of the sheetrock and found that the water-damaged walls in both units had the same defects. (*Id.* at 20). Specifically, the front and rear walls were completely loose at the bottom and had moved up to 1 inch, and the storage closet decks were detached at the base plate. One of the walls of the conference center in Building 2 was also detached and moved out up to half an inch. (*Id.*). Day recommended that all damaged components and framing members be replaced, and that all detached walls be re-secured or rebuilt where necessary. (*Id.* at 21).

18

In a December 2017 report, Day indicated that he and another employee of CASA Engineering had inspected all residential units in Buildings 3 and 6. (*Id.* at 25). Day observed at least one sign of damage or distress from the wind and rain in every unit. (*Id.* at 25-26). He concluded that:

> The observed conditions indicate that exterior wall displacement occurred during the event from exposure to wind generated pressures in excess of what the walls could resist. This displacement damaged the exterior cladding materials and created breaches that resulted in water infiltration that further damaged these walls. Water intrusion also occurred at numerous locations from flashing blown off during the storm, broken windows, and breaches in exterior finishes.

(*Id.* at 26). Accordingly, Day recommended that all EIFS, stucco cladding, windows, and doors be replaced to avoid further water intrusion. (*Id.*). All of Day's reports are accompanied by pictures of observed damage. (*See generally id.*).

In his August 2020 deposition, Day testified to the following. (D.E. 145-23). His work at the property started prior to Hurricane Harvey and included repairing parts of the roof on Buildings 2, 3, and 6. (*Id.* at 54). Parts of the roofs on those three buildings were flapping up and down prior to being secured, and parts of the Building 2 roof had holes. (*Id.* at 54-55). The roofs were secured and temporarily repaired prior to Hurricane Harvey. (*Id.*). He did not know how much the window caulking on Buildings 2, 3, and 6 had deteriorated before Hurricane Harvey. (*Id.* at 92-93). In his report, he was attempting to identify what looked like fresh or new damage. (*Id.* at 93). He could not say that none of these issues existed prior to the hurricane. (*Id.* at 98). However, the cracking in the walls and ceilings "was clearly new" because there was no aging and the surfaces were clean. (*Id.* at 100-01). Some of the air conditioning units were not properly secured before

Hurricane Harvey and had potentially caused damage on the roof and at ground-level, but they did not cause any of the wall damage. (*Id.* at 109-11). Any damages recorded in his reports were caused by Hurricane Harvey. (*Id.* at 115-16). The damage was clearly new because wall movement to the extent scene in the units would have made them unlivable. (*Id.* at 124). His report did not call for the replacement of all eaves or framing, for example, but only those that needed to be replaced. (*Id.* at 128). Day disagreed with any report that said the moisture damage, sheetrock damage, and stress around the doors and windows was pre-existing. (*Id.* at 147).

In a July 2021 affidavit, Day stated that all of the displaced or broken walls, siding, windows, and doors at Port Royal were caused solely by Hurricane Harvey winds and debris. (D.E. 189-10 at 3). Further, 85% of the exterior curtain walls of Building 3 were displaced, and while around 20% of the metal studs showed significant rust or section loss, the wall displacement was entirely caused by the hurricane. (*Id.*). The numbers for Building 6 were similar. (*Id.* at 3-4). Further, any loose roof panels on Buildings 2, 3, and 6 were caused solely by Hurricane Harvey. (*Id.* at 4).

Here, Day's new affidavit is supplementary to his prior reports and his deposition testimony. In his reports, Day consistently noted significant damage to all of the buildings caused by Hurricane Harvey, including broken windows, displaced walls, impact damage, damaged and lose air conditioning units, damaged and loose roof panels, and water saturation of all floors in Building 2, among other issues. (D.E. 214-1 at 1-3, 20-21, 25-26). Similarly, in his deposition, while he noted that he could not definitively state that none of the issues existed prior to the hurricane, he explained that he was specifically

looking for damage that looked new due to lack of aging and cleanliness.  (D.E. 145-23 at 93, 98, 100-01).  He stated that all the damage in his reports was caused by Hurricane Harvey.  (*Id.* at 115-16).  His new affidavit is consistent with and supplements both his testimony and his reports and primarily repeats the same things he said in both.  (D.E. 189-10 at 3-4).  Because the new affidavit did not alter Day's prior reports and deposition, but rather reiterates the same points and adds some small details, it was neither untimely nor a sham.  Day was designated as an expert witness who would testify regarding "the cause and origin of the hurricane damage," so the fact that he may testify regarding these issues was known at the time of the deposition.  (D.E. 145-7).

As to competency, the affidavit is not merely conclusory.  Day began working at Port Royal before the hurricane, including repairing the roofs on Buildings 2, 3, and 6.  (D.E. 145-23 at 54).  His first report after the hurricane was in September 2017, soon after the hurricane damage occurred in late August 2017, and continued to conduct investigations and complete reports for several months.  (*See* D.E. 214-1).  Day's experience working at the property before the hurricane and his investigation of the property soon after the hurricane provide a basis for him to offer an opinion regarding whether any damage was new or preexisting.  As to the roofs, Day had specifically worked on and repaired the roofs prior to the hurricane and was aware of existing issues, like some air conditioning units being improperly secured.  (D.E. 145-23 at 54-55, 109-11).  Accordingly, as with Lamont, when considered in the context of both his reports and his deposition testimony, the conclusions in Day's new affidavit are not merely conclusory.

The new affidavit is supplementary to Day's reports and deposition testimony, not contradictory or entirely new. Accordingly, it is recommended that Landmark's motion (D.E. 208) be **DENIED** as to Day's affidavit.

> d.   Smith

Port Royal designated Smith as a retained expert who would testify "regarding the business income loss to the insured property." (D.E. 145-7 at 2-3).

In his October 2020 deposition, Smith testified to the following. (D.E. 145-40). His interruptions regarding business income interruption was based on the entire Port Royal complex rather than any particular unit or building. (*Id.* at 15-16). The major sources of revenue for the complex were unit income, food and beverages, an in-house travel agency, and potentially another source that he could not remember. (*Id.* at 16). Smith never examined which particular units were available for rent at any particular time. (*Id.* at 16-17). Smith's analysis of business income losses ended in October 2019 solely because he was not provided any information for the time period after that. (*Id.* at 18-19). Accordingly, his analysis did not include any calculation for when tenant occupancy could have been restored or any similar issue. (*Id.* at 19-21). His analysis also did not include any consideration of generally unfavorable business conditions in the area after the hurricane. (*Id.* at 21-22). He completed "more of a simple comparison from prior year to post-loss period." (*Id.* at 22, 48-49). He had not yet done an analysis on loss of revenues that happened after Hurricane Harvey but were connected to another source. (*Id.* at 22). His opinion regarding what losses should be included was based on discussions with Port

Royal employees.  (*Id.* at 49).  His calculations were largely similar to their calculations and he could not think of any specific differences between them.  (*Id.* at 68).

In a July 2021 affidavit, Smith stated that, in order to determine the value of business income losses that happened after Hurricane Harvey, but were connected to another source like subsequent rain storms, he would make a calculation regarding the quantum of those losses.  (D.E. 196-1 at 3).  He then explained what this calculation would be.  (*Id.* at 3-4).  He noted that he was asked during his deposition whether he had done this, but was not asked how he would do it.  (*Id.* at 2-3).

Here, Smith's new affidavit is not merely supplementary to his deposition testimony, and the new content in his affidavit would be untimely if now disclosed.  Smith is a retained expert who was required to provide a report under Rule 26.  Fed. R. Civ. P. 26(a)(2)(B).  Such reports must be "detailed and complete," and they cannot be sketchy, vague, or preliminary in nature.  Fed. R. Civ. P. 26 Advisory Committee's note; *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996).  At his deposition, Smith admitted that he had not done an analysis on loss of revenues that happened after Hurricane Harvey but were connected to another source.  (D.E. 145-40 at 22).  Now, in his affidavit, he outlines how he would complete such an analysis.  (D.E 196-1 at 3-4).  The problem for Smith and Port Royal is that Port Royal's expert designations and reports were due by March 4, 2020.  (*See* D.E. 92 at 2).  While a party may supplement a previous expert report, this new analysis would not merely supplement Smith's prior reports, it would add substantial new information about a question central to the business income claims: how much loss was due to Hurricane Harvey and how much loss was due to subsequent events.

Supplemental disclosures cannot be used to extend "the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club*, 73 F.3d at 571. This information was available at the time of the initial disclosure, and Port Royal has not shown that a late disclosure would be substantially justified or harmless. Fed. R. Civ. P. 37(c).

Accordingly, because Smith's affidavit does not merely supplement his prior report and deposition, and instead outlines an entirely new analysis that had not been completed by Port Royal's expert disclosure deadline, it is recommended that Landmark's motion (D.E. 208) be **GRANTED** as to Smith and that Smith's affidavit (D.E. 196-1) be **STRICKEN**.

  *e.   Spencer*

Port Royal designated Spencer as a retained expert who would testify "regarding the cause and origin of the hurricane damage to the insured property." (D.E. 145-7 at 3).

In his November 2020 deposition, Spencer stated the following. (D.E. 145-22). He had not reviewed the policy and was not going to offer opinions on what damage was covered and what was not covered. (*Id.* at 69-70). His report did not distinguish between damage caused by Hurricane Harvey and other damages. (Id. at 107-08). EIFS was applied to the concrete walls at Port Royal, while stucco was applied to the walls between the concrete structure. (*Id.* at 152). "Stucco" referred to "a Portland cement plaster with the integral finish," while "EIFS" referred to an "insulation board with the finish material over the top of it." (*Id.* at 153). While some buildings were designed for water to be evacuated from behind the stucco system, Port Royal was designed to not let any water into the wall system so that all water that hit the exterior would stay on the exterior. (*Id.* at 154).

24

However, this also meant that any water that reached the interior would not be able to escape. (*Id.* at 154-55). Port Royal had applied multiple coatings of stucco and EIFS over the years as routine maintenance. (*Id.* at 155). Spencer had not quantified how much damage was caused by Hurricane Harvey and how much damage was caused by some other event. (Id. at 165).

In his July 2021 affidavit, Spencer stated that Port Royal used three different exterior finishes, including: (1) stucco assembly over exterior gypsum sheathing and metal framing; (2) EIFS over concrete; and (3) direct applied finish over concrete. (D.E. 189-9 at 2-3). He attached a diagram showing where these three finishes were located on Buildings 3 and 6. (*Id.* at 5).

Here, Spencer's new affidavit is supplementary to his deposition testimony. Spencer primarily reiterates the same facts in both his deposition and his affidavit, namely that EIFS was applied to concrete walls at Port Royal, while stucco was applied to other walls. (D.E. 145-22 at 152-53; D.E. 189-9 at 2-3). He attached a new diagram to his affidavit showing what types of finishes were on which walls, but this diagram did not contradict his earlier testimony and merely illustrated that testimony in a graphical form. (D.E. 189-9 at 5). In its motion, Landmark does not indicate which opinion in Spencer's affidavit it takes issue with, but rather states only that he has provided new opinions after the designation deadline. (D.E. 208 at 4, 6). Although the motion provides details about Landmark's objection to the other new affidavits, it does not address Spencer's affidavit in any detail. *See* Fed. R. Evid. 103(a)(1) (stating that a party objecting to submitted evidence must make specific objections).

Accordingly, because Spencer's new affidavit is consistent with his prior deposition testimony and Landmark has not outlined its specific objections to the contents of the affidavit, it is recommended that Landmark's motion (D.E. 208) be **DENIED** as to Spencer.

        *f.*    *Wheaton*

Port Royal did not designate Wheaton as either a retained expert or as a fact witness with potential expert testimony. (*See* D.E. 127; D.E. 145-7). Port Royal merely identified him in its initial disclosures as an individual who investigated the property and may have discoverable information. (D.E. 189-11 at 4).

In an April 2018 report, Wheaton, a professional engineer, indicated that there was extensive damage to the HVAC systems at Port Royal due to Hurricane Harvey, including physical damage, electrical issues, displaced refrigerant lines, and base support damage. (D.E. 214-2 at 3). He also indicated that there could be other issues including electronic control failure and motor winding damage that would not become evident until after reconstruction began. (*Id.* at 3-4). Based on his observations at the property, Wheaton recommended "100% HVAC system replacement." (*Id.* at 4).

In a July 2021 affidavit, Wheaton stated that he performed inspections of the condensers on the roof of Building 2 before Hurricane Harvey and that all were operating. (D.E. 189-12 at 3). However, after the hurricane, he observed condenser units that were badly damaged by the storm, including having crushed casings, broken or torn off refrigerant lines, and torn out electrical connections. The damage to the condensers

required replacement of the HVAC systems due to environmental regulations regarding the type of refrigerant used. (*Id.*).

Although Port Royal asserts that Wheaton was properly designated as a fact witness with expert knowledge, that is not the case. (*See* D.E. 145-7; D.E. 214 at 15). Only Lamont and David Vinson were so designated, while Wheaton was not designated at all. (*See id.*). Wheaton personally observed the property and damage following Hurricane Harvey and can therefore testify as a fact witness. Although he says in his affidavit that he was "retained by Port Royal for the purpose of estimating the reasonable costs of repairs to the property and to properly evaluate the cause of its loss and damage," it does not appear that he was retained specifically to provide expert testimony. (D.E. 189-12 at 2). Indeed, Wheaton began his work at Port Royal before Hurricane Harvey. (*Id.* at 3). Thus, Wheaton was not required to submit an expert report under Rule 26(a)(2)(B). However, if Port Royal intended to have Wheaton provide expert opinions, it was nonetheless required to disclose the subject-matter on which Wheaton may testify as an expert and a summary of the facts and opinions to which he was expected to testify. *LaShip, L.L.C. v. Hayward Baker, Inc.*, 680 F. App'x 317, 324 (5th Cir. 2017); Fed. R. Civ. P. 26(a)(2)(C). Port Royal did not do this.

Accordingly, because he was never designated as an expert and Port Royal did not disclose the subject-matter to which he was expected to testify, it is recommended that Landmark's motion (D.E. 208) be **GRANTED** as to Wheaton and that Wheaton's affidavit (D.E. 189-12) be **STRICKEN** to the extent he offers an expert opinion regarding the reasonable costs of repairs to the property and the cause of its loss and damage. To the

extent that he discusses his own observations of the damage at the property, he may do so as a fact witness only.

### III.  GENERAL LEGAL STANDARDS

#### a.  *Summary Judgment Standard*

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id.*  The Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Salazar-Limon v. City of Houston*, 826 F.3d 272, 274-75 (5th Cir. 2016).  In doing so, the Court can credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  Furthermore, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

b.    *Construction of Insurance Policy Contracts*

When interpreting an insurance policy, Texas courts construe "the policy according to the "general rules of contract construction to ascertain the parties' intent." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). "[N]ot every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). First, courts look at the language of the policy because it is presumed that the parties intended what the words of the contract say. *Gilbert*, 327 S.W.3d at 126   This requires examining the entire agreement to give effect to all provisions so that none are meaningless. *Id.* "The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Id.* "The contract is ambiguous only if the application of established rules of construction leaves an agreement susceptible to more than one reasonable meaning." *TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d

264, 268 (Tex. App. 2005).  Only if an insurance policy remains ambiguous after this examination should courts construe its language against the insurer in a manner that favors coverage.  *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).

## IV.  PORT ROYAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LANDMARK'S SECOND AND TWENTY-SIXTH AFFIRMATIVE DEFENSES (D.E. 143)

In its motion for summary judgment, Port Royal contends that it is entitled to summary judgment on two of Landmark's affirmative defenses that reference an independent intervening or superseding cause of the damage to Port Royal's property.  (D.E. 143 at 3-4).  Port Royal contends that these defenses raise issues of tort law that are inapplicable to breach of contract claims.  (*Id.* at 4).  Instead, Port Royal argues that the comparable theory that applies in first-party property insurance cases is the anti-concurrent causation doctrine.  Port Royal notes that the insurance policy at issue in this case includes an anti-concurrent causation clause and that Landmark raises it in a different affirmative defense.  (*Id.*).  Further, Port Royal asserts that a superseding cause is not an affirmative defense, but rather an element for the jury to consider, and that it would only apply if Port Royal had raised a negligence claim, but it brought only breach of contract claims.  (*Id.* at 5).  Finally, Port Royal asserts that these defenses do not meet the necessary pleading standard.  (*Id.*).

Landmark responds that Port Royal has brought tort claims under the DTPA and Texas Insurance Code.  (D.E. 176 at 2).  It asserts that the superseding cause affirmative defenses relate to two issues, specifically: (1) Port Royal has made no repairs to Building 2, so as long as Port Royal continues to assert bad faith claims regarding Landmark's

handling of their claim, then a superseding cause defense is appropriate to show that the issues with Building 2 are the result of one or more superseding causes; and (2) Port Royal admits that several rain storms caused further damage to the property in 2018, and therefore a superseding cause defense is appropriate to the extent that Port Royal continues to raise bad faith claims because this subsequent damage was caused by the actions of Port Royal's roofing contractor and/or weather events that occurred after the termination of the policy. (*Id.* at 3-4, 6).  Landmark agrees that superseding cause and concurrent causation are both causation concepts, but disagrees that these defenses are the interchangeable.  (*Id.* at 7). Finally, Landmark argues that the applicable pleading standard for affirmative defenses is only fair notice and, regardless, Port Royal cannot show prejudice.  (*Id.* at 4, 7-8).

Port Royal did not reply.

a.   *Relevant Summary Judgment Evidence*

The insurance policy provides that Landmark will not pay for loss or damage caused directly or indirectly by a list of specific events, stating that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  (D.E. 12-1 at 30-32).

Landmark's First Amended Answer includes the following affirmative defenses:

2. Port Royal's damages, if any, are the result of acts and/or omissions, fault, negligence, breach of contract, violation of statute, and/or breach of duty, by or of persons, entities, and/or parties over whom Counter-Defendants had no control and for whom Counter-Defendants have no legal responsibility.  Such acts and/or omissions were the sole cause, sole proximate cause, producing cause, or a new and independent intervening or superseding cause of the alleged injuries to Port Royal. …

31

20. Under the doctrine of concurrent causation, Landmark does not owe coverage for damage caused by non-covered perils if covered and non-covered perils combined to create Port Royal's alleged loss. …

21. Counter-Defendants assert the defenses of independent, intervening, or superseding cause as a bar to coverage for Port Royal's claim, in whole or in part.

(D.E. 126 at 9, 38-39).

    b.   *Applicable Law*

Affirmative defenses are governed by Federal Rule of Civil Procedure 8(c), which provides that "a party must affirmatively state any avoidance or affirmative defense."  Fed. R. Civ. P. 8(c).  The Fifth Circuit has not determined whether the heightened pleading standards announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply to affirmative defenses.  Since those cases, courts in this district have split on which standard applies.  *See, e.g., Trevino v. RDL Energy Servs., Inc.*, 2016 WL 11477431 at *4 (S.D. Tex. Jul. 21, 2016); *United States v. Brink*, 2011 WL 835828 at *3 (S.D. Tex. Mar. 4, 2011).  However, more recent decisions have primarily concluded that the heightened standard announced in *Twombly* and *Iqbal* does not apply.  *See Trevino*, 2016 WL 11477431 at *4; *Fernandes v. VMLC LLC*, 2018 WL 4901033 at *1 (S.D. Tex. Oct. 9, 2018).

Accordingly, to avoid dismissal, a defendant "must plead an affirmative defense with enough factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced."  *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).  "Although absolute specificity in pleading is not required, fair notice of the affirmative defense is."  *Automated Med. Labs v. Armour Pharm. Co.*, 629 F.2d 1118, 1122 (5th Cir. 1980).  In

32

some cases, "merely pleading the name of the affirmative defense...may be sufficient." *Woodfield*, 193 F.3d at 362.  The issue is whether the pleading sufficiently "identif[ies] the affirmative defense in question" and notifies the plaintiff.  *Id.*

"A new and independent cause is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause."  *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450 (Tex. 2006).  However, where an insurance policy contract contains an anti-concurrent-cause clause, the policy language controls over the common law concurrent-clause doctrine. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 607-08 (Tex. 2015).

The elements of a DTPA action are: (1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages. *See* Tex. Bus. & Com. Code § 17.50(a)(1).  "A producing cause is a substantial factor which brings about the injury and without which the injury would not have occurred."  *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995).  "Raising a fact question of producing cause, as with proximate cause, requires some evidence that the defendant's act or omission was the cause in fact of the plaintiff's injury."  *Id.*  "Texas courts have imputed the concept of intervening or superseding causes into the DTPA proof," and "[i]f the defendant can demonstrate that a 'new and independent basis' for the plaintiff's actions exists, such proof may negate the assertion that the defendant's acts were the producing cause of the plaintiff's injury." *Bartlett v. Schmidt*, 33 S.W.3d 35, 39 (Tex. App. 2000).

33

### c.    Analysis

Here, Landmark's inclusion of independent intervening or superseding cause defenses is appropriate because Port Royal has raised DTPA claims in addition to contract claims.  As an initial matter, the pleading standard applicable to affirmative defenses is merely fair notice, and all Landmark was required to do was identify the affirmative defense and notify Port Royal.  *Woodfield*, 193 F.3d at 362.  Landmark did so by including the defenses in its answer, and it is clear that Port Royal understood that these defenses are challenging causation.  As to the inclusion of the defenses in this case, Port Royal is correct that a superseding cause defense is not applicable to their breach of contract claims, which are governed instead by the anti-concurrent-causation clause in the policy.  *JAW*, 460 S.W.3d at 607-08.  However, contrary to Port Royal's contention, this case does not merely involve breach of contract claims.  Port Royal also raised claims under the DTPA and Texas Insurance Code, and the superseding cause defense is applicable to these claims. (D.E. 120 at 13-17); *Bartlett*, 33 S.W.3d at 39.  Port Royal did not file a reply disputing this fact, nor has it withdrawn its claims under the DTPA or Texas Insurance Code.

Accordingly, it is recommended that Port Royal's motion for partial summary judgment (D.E. 143) be **DENIED**.

## V.    LANDMARK'S MOTION FOR SUMMARY JUDGMENT ON PORT ROYAL'S FAILURE TO ALLOCATE CAUSATION AND DAMAGES (D.E. 146)

In its first motion for summary judgment, Landmark contends that Port Royal has failed to meet its burden to allocate between concurrent causes and damages within its counterclaims.  (D.E. 146 at 1).  First, Landmark argues that Port Royal's claims include

34

several categories of non-covered repairs, including preexisting damage, subsequent damage, excluded damage, elective betterments, and code upgrades and repairs that exceed the policy's limits. (*Id.* at 18-20). Landmark asserts that Port Royal's experts have failed to allocate covered from noncovered losses in their analysis, and that Port Royal has accordingly failed to meet its burden to show that the damages it seeks payment for were all covered under the policy. (*Id.* at 21-29). Accordingly, Landmark argues that summary judgment is appropriate because Port Royal's expert designation deadline has expired and it has not met its burden. (*Id.* at 29-30). Finally, Landmark contends that, without a valid claim under the terms of the policy, Port Royal's extracontractual claims must be dismissed as well. (*Id.* at 30-31).

Port Royal responds that Landmark seeks to apply too high a standard of allocation because an insured need only produce evidence that gives the jury a reasonable basis to allocate, and the contention that 100% of given damage is attributable to the covered peril is a defensible position. (D.E. 191 at 7-16, 31-32). Port Royal contends that, as to the roofs, Landmark's payment of funds to repair the roofs showed that it knew it was liable, and regardless, Lamont's estimate, deposition testimony, and affidavit show that he only included covered roof damages. (*Id.* at 17-19). As to the exterior walls, Port Royal argues that Lamont's and Spencer's depositions and testimony establish that all necessary EIFS work is covered under the policy and that noncovered repairs, like repairs to concrete spalling that existed prior to the hurricane, were left out of the repair estimates. (*Id.* at 20-22). As to the interiors, Port Royal asserts that Lamont's and Day's statements establish that damage from subsequent weather events was not included in the estimates. (*Id.* at 22-

35

24).   As to elective betterments, Port Royal argues that Landmark has presented no evidence in support of their claim that any of the expenses were due to elective betterments. (*Id.* at 24-26).   As to code upgrades, Port Royal asserts that Landmark as advanced no evidence to support that code upgrades unrelated to Hurricane Harvey were included in Port Royal's estimates, and that the testimony from Lamont, Wheaton, and other establishes this.  (*Id.* at 26-31).

Landmark replies that Port Royal's reliance on Lamont's estimates is misplaced because Lamont testified during his deposition that he was not asked to allocate damages and has provided no methodology to explain how he could have allocated damages.  (D.E. 211 at 2-4, 6-7, 10-14).   Landmark asserts that depreciation of covered damage and allocation of noncovered damage are not the same concept.  (*Id.* at 4-5, 18-21).  It contends that, when concurrent causation and allocation issues are beyond a layperson's understanding, the insured is required to present expert testimony that includes a discernable methodology and is not merely conclusory.  (*Id.* at 8-9).

The parties have also submitted various supplemental authorities and responses. (D.E. 215, 219, 230, 233, 235, 238, 239, 251, 256).

 a.   *Relevant Summary Judgment Evidence*

The policy provides for a $1,000,000 sublimit for ordinance or law coverage.  (D.E. 145-1 at 14).   The policy specifically covers Buildings 2, 3, and 6 for losses caused by a windstorm or hail.  (*Id.* at 15).   The policy includes a general exclusion for coverage of EIFS damaged by a windstorm or hail, but the exclusion "does not apply to [EIFS] that is applied to concrete."  (*Id.* at 43).

36

In October 2013, Austech Roof Consultants, Inc., completed a roof assessment on Buildings 2, 3, and 6.  (D.E. 145-8 at 1-2).  Austech concluded that "[r]usting of the metal roof system and underlying structure is occurring at all of the roof areas."  (*Id.* at 2).  This rusting was observed on both the outer roof areas and the underlying support structure. (*Id.*).  Buildings 3 and 6 both had numerous patches in their roofs, and the "[l]ocations and quantity of patches indicate[d] that underlying metal roofing panels [had] experienced widespread deterioration."  (*Id.* at 4).  In one example on Building 2, "the metal roof [had] rusted through creating a hole that [was] allowing water to enter the structure."  (*Id.* at 5). Austech recommended replacing all roofs as soon as funds were available.  (*Id.* at 6).

In May 2014, Naismith Engineering, Inc., completed a structural assessment of Port Royal.  (D.E. 145-16).  They concluded that the buildings were in good condition for buildings of their age and location, but also found several issues that needed to be repaired, including cracking throughout slabs, beams, and walls.  (*Id.* at 6-7).

In May 2016, Day completed a roof assessment on Buildings 2, 3, and 6 for CASA Engineering.  (D.E. 145-9 at 1).  Day observed significant corrosion on areas of all three roofs, breached or bubbling elastomeric coatings on all three roofs, a hole in the roof of Building 2, and several other issues.  (*Id.* at 1-3).  Day concluded that the "metal roof systems have sustained moderate to severe corrosion at R-panels and purlins and exposed ends of structural steel."  (*Id.* at 3).  Accordingly, he recommended that: (1) all R-panel decking be replaced; (2) the parapet wall covering and cap flashing be replaced; and (3) all metal purlins with any section loss be replaced.  (*Id.* at 4).

In September 2017, following Hurricane Harvey, Day completed another damage assessment for CASA Engineering. (D.E. 145-10 at 1). He noted that the purlins on Buildings 3 and 6 had suffered significant corrosion over time, but also that any loose roof panels were caused by the hurricane. (*Id.* at 1-2). He also noted that the roof of Building 2 was completely displaced and that water had traveled from the third floor to the first floor. (*Id.* at 2). He concluded that all three buildings needed completely new roofs, which could not be placed on corroded purlins, so the purlins also had to be replaced. (*Id.* at 3). Day recommended that all broken windows be replaced, the damaged curtain walls on Buildings 2 and 3 be rebuilt, and damaged EIFS have isolated repairs. (*Id.*).

In October and November 2017, BSC Forensics completed an investigation of the damage at Port Royal at the request of TWIA. (D.E. 154-1, 154-2, 154-3). As to Building 2, BSC stated that the hurricane winds removed several portions of the roof, and that while purlins remained in place, the removal of fasteners and the corroded condition of the purlins made them unsuitable for reconstruction. (D.E. 154-1 at 5). The investigation showed several displaced walls, fractures in stucco and EIFS, and significant moisture damage caused by storm-created openings. (*Id.* at 6-20). BSC also concluded that long-term deterioration caused corroded steel plates, purlins, and girders on the roof. (*Id.* at 20). As to Building 3, BSC's findings were largely similar. (D.E. 154-2 at 3-13). However, the investigation also showed that "many of the roof panels that remained in place exhibited rust-deteriorated metal at the fastener holes through the panels, where the panels had rust-deteriorated to the point that the hole in the metal panel was larger than the diameter of the screw fastener head, and the metal panels were loose and could be lifted by hand." (*Id.* at

6).  BSC estimated that around one-quarter to one-third of the purlins would need to be replaced due to rust, and also noted potential code issues with the purlin spacing.  (*Id.*).  There was also significant rust and corrosion in the perimeter curtain walls that limited the wind resistance of the building.  (*Id.* at 8).  BSC created an extensive list of issues that were not caused by the hurricane, including cracks throughout the building, fractures in the EIFS in areas not exposed to wind, and deficiencies in the windows.  (*Id.* at 12-13).  Finally, as to Building 6, BSC observed the same conditions and reached essentially the same conclusions as for Building 3.  (D.E. 154-3 at 3-16).

In October 2018, Spencer completed damage assessments on Port Royal for Wiss, Janney, Elstner Associates, Inc.  (D.E. 145-11, 145-12).  The reports discuss all damage found at the property following Hurricane Harvey.  (*See id.*).

At a February 2019 Board of Directors meeting, Port Royal president William Mann stated that Port Royal believed it would be eligible for PACE funding from the state.  (D.E. 145-30 at 3).  PACE was a loan program funded by the state that required the use of specific green and energy efficient parts, equipment, and technology.  As a result of this attempt to get PACE funding, Port Royal installed specific duct work, air-conditioner condensers, and lighting.  However, Port Royal ultimately did not qualify for the funding due to its organizational structure.  (*Id.*).

In April 2019, Unified Building Sciences and Engineering, Inc. ("UBSE") completed an evaluation of the damage at Port Royal.  (D.E. 145-13).  The report noted that the original R-panel roofing on Buildings 3 and 6 was being replaced with standing seam metal panel roofing.  (*Id.* at 4).  UBSE concluded that the EIFS cladding experienced

limited damage associated with debris impact, and metal R-panel roofing would experience limited damage associated with debris impact, but any other damage that occurred was due to preexisting, long-term conditions associated with deterioration and/or deferred maintenance. (*Id.* at 13-14).

In November 2019, Lane K. Jarvis, Jr., completed a preliminary roof inspection on Buildings 3 and 6, concluding that the "general quality of work evidence in the new metal roof is marginal to poor." (D.E. 145-26 at 2). Jarvis concluded that, as a result of poor workmanship and unfinished portions of the new roofs, it would be necessary to replace much of the new roof that had already been installed and that additional remediation was necessary to both the interiors and exteriors of the buildings due to additional water damage that resulted from the poor repairs. (*Id.*).

In February 2020, Anurag Jain completed a damage investigation of Port Royal's property. (D.E. 145-18). Jain observed several issues with the EIFS caused both by impact damage and water damage. (*Id.* at 24). Jain's report included several repair recommendations for multiple parts of the building, but also offered statistics regarding the percentage of windows that suffered certain types of damage as a result of the hurricane and needed to be completely replaced. (*Id.* at 27-28). Ultimately, Jain recommended that all windows be replaced, and all stucco and EIFS be replaced. (*Id.* at 3).

In his November 2020 deposition, David Vinson testified to the following. (D.E. 145-19). He was a roofing consultant, although he also worked on issues regarding the walls and foundation. (*Id.* at 10). He was currently employed by Amtech Solutions, Inc. (*Id.* at 11). His estimates did not discuss the issues of causation or what was covered by

the policy. (*Id.* at 41). He was not planning to offer any expert opinion regarding the concurrent causation doctrine or allocation between covered and non-covered damage. (*Id.* at 43). At the time of the hurricane, the roofs on Buildings 2, 3, and 6 had yet to be replaced. (*Id.* at 48). After the roofs on Building 4 and 5 were replaced in 2016, some temporary repairs were made to the other three buildings to make them last up to five more years. (*Id.* at 52). His estimates were based on the cost for the installed product and did not separate out what was necessary for code upgrades specifically. (*Id.* at 63). He never offered advice on what repairs were covered under the policy, but his estimate is based on damage that he believed was caused by the storm. (*Id.* at 85-86). However, his estimates were not based on insurance coverage. (*Id.* at 87). The issue of what was and was not covered by the policy he deferred to someone else. (*Id.*).

In December 2020, Brett Lochridge completed an evaluation of the damage at Port Royal for Unified Building Services, Inc. (D.E. 145-14). Lochridge noted that prior reports showed significant existing corrosion and deterioration, along with other issues, that were not considered or removed in Lamont's valuation. (*Id.* at 12-13). Lochridge found that the MEP expenses included upgrades in an attempt to receive state PACE funding, and that Wheaton and Lamont failed to segregate any of these expenses or offer any explanation for how they reached the final cost. (*Id.* at 17). Similarly, Lochridge concluded that Lamont's valuation for roof repairs included substantial framing and purlin replacement that was necessary due to preexisting damage, not because of the hurricane. (*Id.* at 18).

In his December 2020 deposition, Anurag Jain, testified to the following.  (D.E. 145-24).  He was a structural engineer.  (*Id.* at 8).  He had not seen or reviewed the policy to determine what was covered, not covered, or excluded, and had no opinion on those subjects or on allocation of damage between causes.  (*Id.* at 61).  He also had no opinion regarding how much damage to the doors and windows was preexisting, but he did observe some water penetration and corrosion that occurred before the hurricane.  (*Id.* at 70, 94).  Jain stated that any exterior wall movement would have been due to the hurricane, but he had not quantified whether any walls were in a weakened state due to preexisting corrosion.  (*Id.* at 147).  The preexisting corrosion to the walls likely diminished its capacity to resist wind loads, but the wall nonetheless shifted specifically due to the wind loads.  (*Id.*).

In her December 2020 deposition, Port Royal corporate representative Kendra Kinnison testified to the following.  (D.E. 145-21).  Every time it rained, there was water intrusion into the buildings.  (*Id.* at 226).  None of the roofs on Buildings 2, 3, or 6 had been replaced in their entirety.  (*Id.* at 227).  Port Royal sought loans to make upgrades that Wheaton believed would qualify it for state PACE funding, but the property ultimately did not qualify for such funding and never received any.  (*Id.* at 235-36).

> b.  *Applicable Law*

"The doctrine of concurrent causes limits an insured's recovery to the amount of damage caused solely by the covered peril. Because an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof."  *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 302-03 (Tex. App.—San Antonio 1999, pet.

42

denied).   When the insurer invokes uncovered perils as a cause of the damage, it is the insured's burden to submit evidence that shows how the damages should be allocated. *Hooker v. United Prop. & Cas. Ins. Co.*, No. 2:18-CV-424, 2020 WL 5367046, at *3 (S.D. Tex. Sept. 8, 2020).   "Under Texas law, allocation is an issue of fact, unless the insured fails to present any evidence regarding allocation." *Companion Prop. & Cas. Ins. Co. v. Opheim*, 92 F. Supp. 3d 539, 548 (N.D. Tex. 2015).

"Although a plaintiff is not required to establish the amount of his damages with mathematical precision, there must be some reasonable basis upon which the jury's finding rests."   *Wallis*, 2 S.W.3d at 304.   In other words, the insured need not present "overwhelming evidence that would allow a jury to flawlessly segregate covered [losses] from non-covered [losses]," but rather must present evidence that could reasonably allow the jury to deduce which losses were covered and which were not.   *Fiess v. State Farm Lloyds*, 392 F.3d 802, 808-09 (5th Cir. 2004).   The insured can properly take the position that 100% of the loss was caused by a covered peril, so long as that contention is supported by admissible evidence.   *Hooker*, 2020 WL 5367046 at *3.   At the summary judgment stage, the insured need not conclusively prove that covered perils caused 100% of the loss, but rather must only raise a disputed issue of material fact.   *Id.* at *4.   Nonetheless, "[f]ailure to provide evidence upon which a jury or court can allocate damages between those that resulted from covered perils and those that did not is fatal to an insured party's claim." *Nat'l Union Fire Ins. v. Puget Plastics Corp.*, 735 F.Supp.2d 650, 669 (S.D. Tex. 2010).

An insurer's prior indication that a portion of a claim is undisputed does not relieve the insured of its burden to provide summary judgment evidence to allow the jury to segregate covered losses from non-covered losses. *Prime Time Fam. Ent. Ctr., Inc. v. AXIS Ins. Co.*, 630 S.W.3d 226, 231 (Tex. App. 2020).

"[L]ay-witness testimony about the condition of property prior to an alleged covered loss can create a genuine dispute of material fact on an issue of concurrent causation." *Generation Trade, Inc. v. Ohio Sec. Ins. Co.*, 3:18-CV-0434-K, 2019 WL 3716427, at *1 (N.D. Tex. Aug. 6, 2019).  Disputes over this testimony go to the weight of the witness's opinions, not the admissibility.  *Hooker*, 2020 WL 5367046 at *3.  Circumstantial evidence may also be sufficient to meet the burden to allocate.  *Lyons v. Millers Cas. Ins. Co. of Texas*, 866 S.W.2d 597, 601 (Tex. 1993).  However, "[p]roof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006).

    *c.   Analysis*

Here, Port Royal has met its burden at this stage by offering evidence that 100% of its claim is based on damage caused by Hurricane Harvey.  There is certainly evidence in the record of existing corrosion and other preexisting infirmities at Port Royal's property. (*See, e.g.,* D.E. 145-8 at 2; D.E. 145-9 at 103; D.E. 145-16 at 6-7; D.E. 145-20 at 193, 199-200; D.E. 145-23 at 92-93; D.E. 154-1 at 5, 20; D.E. 154-2 at 6, 12-13).  Similarly, there

is evidence of necessary code upgrades and other potential betterments that Port Royal installed in the process of repairing the property. (*See, e.g.,* D.E. 145-20 at 297; D.E. 145-30 at 3; D.E. 154-2 at 6). However, Port Royal's witnesses have consistently stated that their estimates and reports identified damage that was caused by Hurricane Harvey. Lamont testified that his estimates included what he thought was a reasonable cost to repair or replace the covered portions of the damage. (D.E. 145-20 at 125). He has consistently testified and stated that Port Royal did not make any claims for preexisting damage. (Id. at 290, 293; D.E. 189-8 at 4-8). As discussed above, Lamont personally inspected the property, took photographs, and performed moisture tests, and therefore has a basis to offer his opinions. (D.E. 189-8 at 3). Similarly, Day both inspected and worked on the property before and after Hurricane Harvey, and has opined that any loose roof panels were caused by the hurricane, any wall displacement was caused by the hurricane, and his reports identified only fresh damage that was caused by the hurricane. (D.E. 214-1 at 1-2, 26; D.E. 145-23 at 54-55, 93, 100-01, 115-16, 124, 147). Vinson testified that the roofs were repaired to last up to another five years in 2016 and that his estimate was based on damage that he believed was caused by the storm. (D.E. 145-19 at 52, 85-86). Jain testified that, despite any preexisting corrosion, all wall movement was caused by the hurricane. (D.E. 145-24 at 147).

This evidence supports Landmark's argument that 100% of its claimed loss was caused by Hurricane Harvey and therefore covered under the policy, at least enough to create a disputed issue of material fact at summary judgment. Landmark, of course, disagrees with the opinions offered by Port Royal's witnesses and has evidence to the

contrary, much of which is summarized above. However, this is summary judgment. It is not the Court's role to weigh this evidence. *Caboni*, 278 F.3d at 451.

As noted in *Hooker*, if the jury concludes that a non-covered peril caused some of the loss, then its allocation between covered and non-covered losses must be supported by evidence. *Hooker*, 2020 WL 5367046 at *4. However, it is unnecessary to reach the issue of exactly how much of the damage was caused by a covered peril at this stage because the jury is also entitled to believe that all of the claimed loss was caused by a covered peril. *Id.* Port Royal need only raise a disputed issue of material fact regarding causation, and it has done so. Finally, Landmark focuses on the testimony from Port Royal's various witnesses that they did not review the policy and were not designated to testify regarding allocation or concurrent causes. However, as noted above, these witnesses, and their reports, also indicated that their estimates and observations were based on damage *caused by* Hurricane Harvey. Even lay witness testimony about the condition of property prior to an alleged loss can create a genuine dispute of material fact on an issue of concurrent causation, so the fact that these witnesses are not explicitly addressing the issue of allocation or concurrent causes is not determinative. See *Generation Trade*, 2019 WL 3716427 at *1.

Accordingly, it is recommended that Landmark's motion for summary judgment on Port Royal's failure to allocate its losses (D.E. 146) be **DENIED**.

46

## VI.  LANDMARK'S  MOTION  FOR  SUMMARY  JUDGMENT  ON  PORT ROYAL'S BUILDING TWO CLAIMS (D.E. 147)

In the next motion for summary judgment, Landmark contends that Port Royal is not contractually entitled to Ordinance or Law coverage and Replacement Cost coverage on Building 2.  (D.E. 147 at 1-3).  As to Ordinance or Law coverage, Landmark argues that the policy required Port Royal to make any such repairs or replacements within two years, which it has failed to do.  (*Id.* at 5-6).  As to replacement cost coverage, Landmark asserts that the policy required Port Royal to make any such repairs "as soon as reasonably possible," which it has failed to do.  (*Id.* at 6-7).  Landmark argues that Port Royal has failed to make repairs to Building 2 to this day, which is an unreasonable delay and well beyond two years from the date of the loss.  (*Id.* at 7).

Port Royal responds that Landmark materially breached the insurance contract by: (1) failing to continue to adjust the loss with Port Royal and instead filing this lawsuit; (2) rejecting Port Royal's proof of loss and request for advance payments; and (3) not making any payments for over a year after the damage occurred.  (D.E. 192 at 4-5).  Port Royal argues that, due to these material breaches of the contract, Port Royal was not required to follow the two-year limitation for Ordinance or Law coverage.  (*Id.* at 5). Regardless, Port Royal contends that the materiality of Landmark's breach is a jury question.  (*Id.*).  Further, Port Royal contends that Landmark waived this argument by delaying payment and underpaying for the damage when it did make payments.  (*Id.* at 6-7).  Similarly, Port Royal asserts that Landmark is estopped from making this argument because Landmark and its agents made several misrepresentations throughout the

47

adjustment process that caused the delay and made it impossible for Port Royal to meet the two-year time frame for repairs.  (*Id.* at 7-9).  Finally, as to Replacement Cost coverage, Port Royal argues that reasonableness is a jury question and that, regardless, Landmark's failure to make proper payments under the insurance contract is what has prevented Port Royal from repairing Building 2.  (*Id.* at 10-11).

Landmark replies that the doctrines of waiver and estoppel cannot be used to expand the scope of an insurance contract to cover time periods or risks that were not originally insured.  (D.E. 209 at 2).  Landmark contends that the policy either provides Ordinance or Law coverage past two years or it does not, and that no waiver or estoppel arguments apply to the application of an insurance contract.  (*Id.* at 2-3).  Landmark argues the same about Replacement Cost coverage, asserting that Port Royal has either repaired Building 2 or it has not.  (*Id.* at 3).  Landmark further argues that Port Royal has implicitly raised a "prevention" argument that Landmark's conduct prevented it from complying with the time limits, but Landmark asserts that this doctrine has never been adopted in Texas.  (*Id.* at 3-5).  Finally, Landmark argues that Port Royal is only entitled to either type of coverage if it "actually repair[s]" the property, which it never has.  (*Id.* at 6-7).

a.   *Relevant Summary Judgment Evidence*

The policy covers losses to Building 2 caused by a windstorm or hail.  (D.E. 145-1 at 15).  It provides ordinance or law coverage where: (1) an ordinance or law that is in force at the time of loss regulates the demolition, construction, or repair of buildings, or establishes zoning or land use requirements at the described premises; and (2) the building sustains direct physical damage that is covered under the policy and results, at least in part,

48

in enforcement of the ordinance or law.  (D.E. 145-1 at 46).  However, Landmark would not pay unless such repairs were "made as soon as reasonably possible after the loss or damage, not to exceed two years." (*Id.* at 48).

Generally, the policy obligates Landmark to pay actual cash value at the time of loss or damage.  (*Id.* at 61).  However, because Port Royal opted for the optional replacement cost coverage, the valuation is instead based on replacement cost, without deduction for depreciation.  (*Id.* at 9, 63).  Landmark would not pay on a replacement cost basis for any loss or damage: "(1) Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage." (*Id.* at 64).

Landmark paid Port Royal $1,616,356.76 for repairs to Building 2.  (D.E. 145-14 at 18).  TWIA paid Port Royal $4,033,000 for repairs to Building 2, which was the limit of TWIA's policy.  (D.E. 145-50 at 2).  However, Port Royal's estimates put the actual cost value of repairs to Building 2 at over $11,000,000.  (*See* D.E. 154-4).

David Vinson, a roofing consultant, testified during his deposition that he recommended that the Port Royal repair take place in phases.  (D.E. 145-19 at 6, 10, 107-08).  Of the eight total phases, the "overall redesign and rebuild of Building 2" was phase six and would have included the replacement of the roof on Building 2.  (*Id.* at 108).  The roof replacement on the other two covered buildings was phase three.  (*Id.*).

Kendra Kinnison, the executive general manager of Port Royal, testified during her December 15, 2020, deposition that Building 2 had not been repaired.  (D.E. 145-21 at 5, 8, 204).  She also believed that Alvarez had unnecessarily caused a delay in repairs by

failing to respond to inquiries regarding whether Port Royal should undertake temporary repairs in order to open for the summer of 2018, which would increase repair expenses, but decrease business interruption expenses. (*Id.* at 189-90). Further, she believed that Alvarez further delayed because he incorrectly viewed the policy as an excess policy rather than a primary policy, and she heard him say on several occasions that he was waiting on TWIA actions. (*Id.* at 192).

Kimberly Kreider-Dusek, a unit owner at Port Royal, testified during her May 13, 2021, deposition that Building 2 had been demolished to a certain extent, but not reconstructed. (D.E. 145-35 at 5-6, 65). She also noted that Alvarez, on at least one occasion, incorrectly referred to the policy as an excess policy rather than a primary policy. (*Id.* at 143-44).

In a March 2018 report to Landmark, Alvarez indicated that he had "received the go ahead to engage Vince Marshall of Trimark Cat Services," a building consultant for TWIA. (D.E. 189-5 at 4). He also indicated that he had engaged BSC, a firm that provided TWIA with engineering analysis. (*Id.*). Alvarez stated that he had met with Marshall, representatives of TWIA, and independent adjusters assigned by TWIA to discuss the current damage estimates. (*Id.* at 5). He noted that he requested copies of Trimark's estimates but had not received them. (*Id.*).

In March 2018, Alvarez e-mailed Dusek and stated that he had spoken to Vince Marshall, the building consultant for TWIA, regarding the scope and pricing of repairs to the buildings. (D.E. 189-4 at 1). However, he also requested additional information on these issues from Dusek. (*Id.*).

50

Alvarez also e-mailed Travis Williams, a forensic accountant, in March 2018, and incorrectly stated that the business interruption coverage only covered Buildings 2, 3, and 6.  (D.E. 189-14 at 2).  Williams prepared a report estimating the business interruption expenses suffered by Port Royal.  (D.E. 189-15 at 2[8]).  During his April 2021 deposition, Williams testified that he did not interpret the policy himself to determine what was covered, but rather relied on the interpretation of others.  (*Id.* at 3[10]).  For example, in his report, any losses that were determined to be caused by a June 2018 rainstorm were not included because his conclusions were based on information he was provided.  (*Id.* at 5-6[19-21]).

In June 2018, claim professional Joe Buffo updated the claim file indicating that he had received contact information for the TWIA supervisor and that Alvarez would follow-up to obtain the TriMark report.  (D.E. 189-13 at 1).  Buffo also noted that Alvarez would reach out to a building consultant about reviewing Port Royal's claim submission and TWIA's expert reports.  (*Id.*).  Buffo confirmed during his deposition that Landmark made the first $500,000 payment for building damage on September 7, 2018.  (D.E. 189-2 at 13-14[51-52, 56]).

In June 2018, Alvarez e-mailed several representatives from TWIA, noting that his client was responsible "after TWIA and once the loss has exceeded the deductibles," and that he understood that TWIA had exhausted their limits of insurance in this case.  (D.E. 189-3 at 1-2).  He indicated that he believed TWIA was willing to have their building consultant, Vince Marshall from Trimark, to keep working on the file.  (*Id.* at 2).  Alvarez

51

requested copies of all estimates previously prepared by Marshall, copies of all invoices from Trimark, and copies of BSC reports and invoices they had not already received.  (*Id.*).

In November 2019, several unit owners in Building 2 sued Port Royal in state court for failure to repair Building 2 with the funds that the insurance companies allocated for Building 2.  (D.E. 145-36 at 1-8).

      *b.*   *Applicable Law*

Under Texas law, "actual cash value" refers to the repair or replacement cost less depreciation.  *Tolar v. Allstate Texas Lloyd's Co.*, 772 F. Supp. 2d 825, 831 (E.D. Tex. 2011).  In contrast, "replacement costs" are subject to depreciation and are "any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss."  *Id.* (citation omitted).  Thus, replacement cost is higher than actual cash value.

It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.  *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).  When a breach is immaterial, the nonbreaching party is not excused from future performance but may sue for the damages caused by the breach.  *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App. 2014).  Whether a party's breach of contract is so material as to render the contract unenforceable is a question of fact to be determined by the trier of fact.  *Id.*  However, "[i]f the non-breaching party treats the contract as continuing after the breach, he is deprived of any excuse for terminating his own performance."  *Henry v. Masson*, 333 S.W.3d 825, 840 (Tex. App. 2010).  "If the non-

breaching party elects to treat the contract as continuing after a breach and continues to demand performance, it obligates itself to perform fully." *Id.* at 841.

Waiver requires either the intentional relinquishment of a right or intentional conduct that is inconsistent with claiming that right. *In re Gen. Elec. Cap. Corp.*, 203 S.W.3d 314, 316 (Tex. 2006). Estoppel "prevents one party from misleading another to the other's detriment or to the misleading party's own benefit." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "[T]he doctrines of waiver and estoppel cannot be used to re-write the contract of insurance and provide contractual coverage for risks not insured." *Id.* at 775. However, in the context of an insurer defending its insured in a lawsuit even where no coverage for the risk existed, the Texas Supreme Court concluded that "if the insurer's actions prejudice the insured, the lack of coverage does not preclude the insured from asserting an estoppel theory to recover for any damages it sustains because of the insurer's actions." *Id.* at 787.

Under the equitable doctrine of prevention, "when a promisor wrongfully prevents a condition from occurring that condition is excused." *Mendoza v. COMSAT Corp.*, 201 F.3d 626, 631 (5th Cir. 2000). However, "no Texas court has employed the doctrine of prevention to vitiate an insured's contractual obligation to repair or replace damaged property before claiming payment for replacement costs. Moreover, in cases where the doctrine has been applied to allow an insured to recover replacement costs, the insurer either completely denied the claim or refused to make any payments until it was too late for the insured, who was frequently an unsophisticated party, to make repairs." *Devonshire Real Est. & Asset Mgmt., LP v. Am. Ins. Co.*, No. 3:12-CV-2199-B, 2014 WL 4796967, at

53

*7 (N.D. Tex. Sept. 26, 2014) (listing cases).  In *Devonshire*, the court concluded that application of the prevention doctrine was inappropriate where both parties were relatively sophisticated, the insurance company had already paid a significant sum to make repairs, and repairs were still capable of being performed.  *Id.*  In that case, the insured was a business that owned an apartment complex damaged by a wind and hailstorm.  *Id.* at *1.  In *Lakeside FBBC, LP v. Everest Indemnity Ins. Co.*, 2020 WL 184405 at *8 (W.D. Tex. Apr. 8, 2020), the court reached the same conclusion in a similar context to both the present case and *Devonshire*.

       c.   *Analysis*

Here, Port Royal does not dispute that it has not repaired Building 2 to this day. However, in order to avoid the application of the policy language stipulating that ordinance or law repairs must be made within two years and that replacement cost repairs must be made as soon as reasonably possible, Port Royal invokes the doctrines of waiver and estoppel.  However, the invocation of these doctrines is unavailing because "the doctrines of waiver and estoppel cannot be used to re-write the contract of insurance and provide contractual coverage for risks not insured." *Ulico*, 262 S.W.3d at 778.

First, as to law or ordinance coverage, the policy states that any such repairs must be "made as soon as reasonably possible after the loss or damage, not to exceed two years." (D.E. 145-1 at 48).  Under the general principles of contract law, in order to raise this claim and obligate Landmark to provide the ordinance or law coverage specified in the policy, Port Royal was required to perform its end of the contract by completing such repairs within two years.  *Henry*, 333 S.W.3d at 840.  Port Royal seeks to invoke the waiver and

estoppel doctrines to avoid the two-year time limitation in the policy, but the doctrines cannot be used to re-write an insurance contract and provide coverage for risks not insured. *Ulico*, 262 S.W.3d at 778. Under the language in the policy, ordinance or law repairs made more than two years after the loss are not covered. Port Royal cannot use waiver and estoppel to avoid this fact.

Second, as to the time limitation for replacement cost coverage, the policy more vaguely states that such repairs must be "made as soon as reasonably possible after the loss or damage." (D.E. 145-1 at 64). However, the policy also provides that replacement cost coverage is not available "[u]ntil the lost or damaged property is actually repaired or replaced." (*Id.*). Port Royal again seeks to use the doctrines of waiver and estoppel to write this requirement out of the policy, but the doctrines cannot be used for that purpose. *Ulico*, 262 S.W.3d at 778. The undisputed evidence shows that Port Royal has made no repairs to Building 2 despite receiving over $5.5 million in insurance funds specific to that building, and under the language in the policy, it is not entitled to any replacement cost coverage until after the building has been repaired.

Finally, while Port Royal did not specifically invoke the doctrine of prevention, Landmark correctly notes that Port Royal's arguments are best construed as arising under that doctrine. In short, Port Royal's argument is that it was prevented from fulfilling its end of the contract by Landmark's failure to fully compensate it for repairs under the terms of the policy and therefore was not required to make the repairs in the time frames specified. (*See generally* D.E. 192 at 4-11); *Mendoza*, 201 F.3d at 631 (defining the doctrine). However, like the waiver and estoppel doctrines, courts have routinely declined

to apply this doctrine to insurance contracts.  *See, e.g., Devonshire*, 2014 WL 4796967 at *7; *Lakeside*, 2020 WL 184405 at *8.  *Devonshire* is analogous to this case.  There, a relatively sophisticated commercial insured party sued an insurance company seeking replacement cost value, contending that the insurance company's failure to pay the full actual cash value relieved it of the obligation to make repairs before receiving replacement costs.  *Devonshire*, 2014 WL 4796967 at *1-2, 7.  The court noted that no Texas court had ever applied the doctrine of prevention in this context.  *Id.* at *7.  Further, the court noted that other state courts that had applied the doctrine to allow an insured to recover replacement costs did so only where: (1) the insurance company completely denied the claim; (2) the insured was an unsophisticated party; and (3) it was too late to make repairs.  *Id.*  In contrast, if the insured was a sophisticated party and the insurance company had already paid actual cash value, courts refused to extend the doctrine.  *Id.*  Thus, in *Devonshire*, the court concluded that extension of the doctrine was inappropriate because the dispute was between sophisticated commercial parties, the insurance company had already paid a significant sum of money to repair the property, and the property was still capable of being repaired.  *Id.*  The same analysis applies here.  Port Royal is a sophisticated commercial party, it has already received over $5.5 million in funds from TWIA and Landmark to repair Building 2, and there is no argument or dispute that the building cannot still be repaired.

Accordingly, it is recommended that Landmark's motion for summary judgment (D.E. 147) be **GRANTED** and that Port Royal's contractual claims for ordinance or law coverage and replacement cost coverage on Building 2 be **DISMISSED**.

### VII.   LANDMARK'S MOTION FOR SUMMARY JUDGMENT ON PORT ROYAL'S BUSINESS INCOME (AND EXTRA EXPENSE) CLAIMS (D.E. 148)

In the next motion for summary judgment, Landmark contends that Port Royal's counterclaims for additional business income and extra expense amounts should be dismissed because: (1) Port Royal's calculations fail to follow the time periods and formulas in the policy; and (2) Port Royal fails to separate Harvey-caused losses and noncovered losses.  (D.E. 148 at 2).  Landmark first contends that Port Royal never specifically pleaded for additional business income or extra expense amounts, which is a basis for summary judgment in itself.  (*Id.* at 4).  Second, Landmark contends that Port Royal merely compared revenues for each month after Hurricane Harvey to revenues for the same month the previous year, but that this calculation did not take into account the period of restoration provided for in the policy, making the calculations unhelpful.  (*Id.* at 7-9).  Third, Landmark argues that Port Royal's expert also failed to rule out non-Harvey causes for the loss of business income, but such losses are not covered by the policy.  (*Id.* at 10-13).

Port Royal responds that, contrary to Landmark's statements, it gave notice of a business interruption claim in August 2017.  (D.E. 197 at 6-8).  Further, Port Royal contends that, during the adjustment period, the obligation to determine claims is on the carrier, who has a common law duty to deal fairly and in good faith.  (*Id.* at 8-9).  Regardless, Port Royal argues that Landmark waived this claim when it issued payment for business income expenses.  (*Id.* at 10).  As to the period of recovery, Port Royal argues that Landmark's delay in resolving the claim is a factor to consider in determining the

proper time period.  (*Id.* at 11-13).  However, Port Royal argues that the determination of the period of recovery is a factual question for the jury.  (*Id.* at 13-15).  Similarly, Port Royal contends that Landmark's allegations regarding subsequent events that affected the period of restoration are a disputed issue of fact.  (*Id.* at 16).  Specifically as to additional losses allegedly suffered during 2018 rainstorms, Port Royal asserts that the existing evidence makes it easy to separate these expenses from Hurricane Harvey expenses if the jury concluded that was necessary.  (*Id.* at 17-18).  Finally, Port Royal argues that the policy does not require it to segregate its business loss income by building.  (*Id.* at 18-21).

Landmark replies that Port Royal has not provided any evidence regarding the period of restoration or supported its claim that an extension could apply.  (D.E. 210 at 2).  Landmark argues that Port Royal has not submitted any evidence to rule out non-Harvey causes other than theoretical calculations of how they might address losses caused by the 2018 storms.  (*Id.* at 3-4).  Landmark asserts that Port Royal has never presented a business income claim that is covered by the terms of the policy.  (*Id.* at 4).  Finally, as in its previous briefing, Landmark argues that the waiver, estoppel, and prevention doctrines have been rejected by Texas courts in the context of insurance policies.  (*Id.* at 5-7).

a.  *Relevant Summary Judgment Evidence*

The policy provides business income loss coverage for "[l]oss of fee income" and "[l]oss of rental income to the 'Owner Participants' in the rental pool."  (D.E. 145-1 at 13).  Landmark would "pay for the actual loss of Business Income [Port Royal sustained] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration'."  (*Id.* at 65).  "Period of restoration" was defined to mean the period of time that: "(1) Begins at

58

the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss;" and that "(2) Ends on the earlier of: (a) The date when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality; or (b) The date when business is resumed at a new permanent location." (*Id.* at 17). "If [Port Royal did] not resume 'operations', or [did] not resume 'operations' as quickly as possible, [Landmark would] pay based on the length of time it would have taken to resume 'operations' as quickly as possible." (*Id.* at 70). The most Landmark would pay for business income loss and extra expense was the lesser of: "(1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the 'period of restoration'; or (2) The Limit of Insurance shown in the Declarations." (*Id.* at 71-72). However, loss of business income had to be "caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss," and loss caused by "unfavorable business conditions caused by the impact" of a covered cause of loss was not covered. (*Id.* at 65, 67).

Following Hurricane Harvey, Landmark advanced over $5,000,000 to Port Royal for business income losses. (D.E. 145-4 at 1; D.E. 145-5 at 1-5).

In a December 2020 report, Travis Williams stated that several factors unrelated to Hurricane Harvey may have impacted Port Royal's business operations, including: (1) a storm in June 2018 that produced 15 inches of rain and caused some units to be removed from the rental pool for repairs; and (2) other storms and quality-of-work issues in repairing units. (D.E. 145-39 at 9). Williams believed that Smith's business interruption calculation was of limited usefulness because Smith merely concluded that any difference in revenues

and expenses from before Hurricane Harvey were as a result of the hurricane, but provided no further analysis of potential other causes or normal business trends that also could have affected revenues and expenses.  (*Id.* at 13-15).

Daniel Carlisle, the insurance agent in charge of Port Royal's account at the time of Hurricane Harvey, stated in an affidavit that he received notice from a Port Royal board member of damage to the property in August 2017 and faxed notice to Landmark.  (D.E. 189-16 at 2).  He attached a copy of this fax, which indicated that Port Royal was making a business interruption claim.  (*Id.* at 6).

### b.   Applicable Law

"An insured bears the burden of showing that it made a claim under the insurance policy."  *United Neurology, P.A. v. Hartford Lloyd's Ins. Co.*, 101 F. Supp. 3d 584, 617 (S.D. Tex. 2015).

Typically, an insured is entitled to business interruption coverage "for the duration of the reasonable period of time needed … to reenter business plus any delay attributable to [the insurer's] failure to perform its duties under the policy, but not for any period of delay caused by other obstacles to restoration such as [the insured's] alleged lack of due diligence or poor financial conditions."  *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 843 F.2d 1140, 1143 (8th Cir. 1988).  Determination of the period of restoration when determining proper business income damages under an insurance policy is a fact question. *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 355 (8th Cir. 1986).

In order for an expert's report to reliably apply the principles and methods employed to the facts of the case, he must address the facts under the language of the insurance policy.

*Hahn v. United Fire & Cas. Co.*, No. 6:15-CV-00218 RP, 2017 WL 1289024, at *4 (W.D. Tex. Apr. 6, 2017).   Experts must provide some basis for the court to evaluate their methodology in relation to the policy requirements.   *Id.* at *5.   If an expert's report does not reliably apply the principles and methods to the facts of the case, the court may exclude the testimony in the consideration of a motion for summary judgment.   *Id.*   "When an expert does not rule out causes of loss other than the one he assigns, that renders his opinion a little more than speculation and therefore, unreliable."   *Kelly v. Travelers Lloyds of Texas Ins. Co.*, No. 14-05-00825-CV, 2007 WL 527911, at *5 (Tex. App. Feb. 22, 2007) (internal quotation marks omitted).

      *c.*    *Analysis*

      Here, as an initial matter, Port Royal adequately pleaded a claim for business income loss.   Port Royal's pleadings allege that Landmark has improperly claimed that there is no covered business income or extra expense loss under the policy and also allege a breach of contract claim based on denial of benefits under the policy.   (D.E. 120 at 8, 11-13).   Further, although Landmark cites *United Neurology*, that case stands for the proposition that an insured bears the burden of showing that it made a claim under the insurance policy.   *United Neurology*, 101 F. Supp. 3d at 617.   Carlyle stated that he faxed notice of a claim to Landmark in August 2017, and that fax indicated that Port Royal as raising a business interruption claim.   (D.E. 189-16 at 2, 6).   Moreover, there is evidence in the record that Landmark was aware of an existing or potential business income claim, including the fact that it paid over $5,000,000 in business income advances.   (D.E. 145-4 at 1; D.E. 145-5 at 1-5).   Also notable is that Landmark's complaint seeks a declaratory judgment on business

income coverage issues.  (D.E. 1 at 28).  It is clear that Landmark had notice of a business income claim.  Second, Port Royal has submitted evidence to establish a disputed issue of material fact regarding the proper period of restoration.  The period of restoration includes the reasonable period of time necessary to reenter business "plus any delay attributable to [the insurer's] failure to perform its duties under the policy."  *Hampton Foods*, 843 F.2d at 1143.  Thus, the question of whether Landmark performed its duties under the policy to pay for all covered property damage losses must be decided before any conclusion can be reached on the applicable period of restoration.

However, Port Royal has not presented evidence to establish that a disputed issue of material fact exists regarding whether all their claimed business income loss was caused by a covered peril.  Smith was the only expert designated to "testify regarding the business income loss to the insured property," and therefore is a proper witness to discuss what portion of the business income loss was due to a covered peril.  (D.E. 145-7 at 2).  Unlike Port Royal's various witnesses on general property damage, however, Smith has never asserted that all the claimed business income losses in his calculations are covered by the policy or caused by Hurricane Harvey.  Indeed, Smith admits that his calculation is "more of a simple comparison from prior year to post-loss period" and does not include any analysis of other potential causes for business interruption, including later storms or generally unfavorable business conditions in the area following the hurricane.  (D.E. 145-40 at 16-17, 21-22, 48-49).  Port Royal carries the burden to allocate between covered and non-covered losses, including on its business income claim, but it has provided no basis to do so on this claim.  *Wallis*, 2 S.W.3d at 302-03.  While a determination of whether some

losses, like those from subsequent storms, were covered or non-covered may depend on the wider question of whether Landmark performed its duties under the policy to pay for all covered property damage, other uncovered losses, like those due to general business conditions in the area or poor workmanship repairs, do not.[4]  Smith has not ruled out any other causes of loss beyond Hurricane Harvey, and his opinion is therefore speculative and unreliable for the purposes of determining how much of Port Royal's business losses were caused by Hurricane Harvey and how much were caused by other, non-covered perils.  *See Kelly*, 2007 WL 527911 at *5.

It is also worth reiterating that Smith's new affidavit, which the undersigned has recommended striking above, does not perform an analysis of covered and non-covered causes either.  In the affidavit, Smith explains how he could separate covered losses from uncovered losses based on evidence in the record, but still does not provide such an analysis.  (D.E. 196-1 at 2-4).  Citing this affidavit, Port Royal contends that any loss from the 2018 storms could be easily quantified.  (D.E. 197 at 17-18).  However, as noted above, the time for Port Royal to disclose non-supplementary expert reports and opinions has passed, and this calculation would not be merely supplementary because it would add substantial new information about how much business income loss Port Royal claims was due to Hurricane Harvey and how much loss was due to non-covered events.  While this is

---

[4] Port Royal contends that there is no evidence of poor workmanship or contractor defects.  (D.E. 197 at 16).  However, Jarvis concluded following a roof inspection that poor workmanship made it necessary to re-do much of the already replaced roof and do further remediation to the interiors and exteriors of the Buildings 3 and 6 due to additional water damage.  (D.E. 145-26 at 2).

only the summary judgment stage, to meet its burden, Port Royal was nonetheless required to present some evidence to create a disputed issue of material fact regarding whether Hurricane Harvey was the sole cause of the business income losses it claims.  It has failed to do so.

Accordingly, it is recommended that Landmark's motion for summary judgment on Port Royal's business income claims (D.E. 148) be **GRANTED** and that Port Royal's contractual claims for business income and extra expense coverage be **DISMISSED**.

## VIII.   LANDMARK'S MOTION FOR SUMMARY JUDGMENT ON PORT ROYAL'S EXTRACONTRACTUAL COUNTERCLAIMS (D.E. 149)

In the final motion for summary judgment, Landmark first contends that there is no evidence in the record that Landmark breached the common law duty of good faith and fair dealing.  (D.E. 149 at 10-12).  Landmark notes that Alvarez acknowledged Port Royal's claim the day it was made, inspected the property two days later, and inspected the property several other times.  (*Id.* at 11).  Landmark contends that the fact that it paid $9,000,000 dollars to Port Royal shows that the investigation was not outcome-oriented or unreasonable.  (*Id.*).  Second, Landmark argues that Port Royal's claims under Chapter 541 of the Texas Insurance Code for unfair settlement fail for the same reason as their bad faith claim.  (*Id.* at 12-17).  Landmark contends that it never disavowed owing insurance proceeds given that it has paid over $9,000,000, including advance payments.  (*Id.* at 14-15).  Landmark refutes that it has taken the position that Port Royal did not sustain a covered business income loss, noting that it has paid over $5,000,000 for business income and extra expense losses.  (*Id.* at 16).  Moreover, Landmark argues that Port Royal has not

adequately pleaded this claim, and that statutory bad faith claims under the Texas Insurance Code require s showing of some unfair or deceptive act by the insurer. (*Id.* at 16-17). As to the DTPA claims, Landmark asserts that Port Royal failed to allege that it relied to its detriment on any alleged act or practice of Landmark, and regardless, has provided no factual support for the claim. (*Id.* at 17-19). As to the claims under the Prompt Payment of Claims Act, Landmark argues that it had 45 days to acknowledge and commence an investigation after being notified of the claim, and it did so only 1 day after the claim. (*Id.* at 20-21). Finally, Landmark argues that mental anguish damages are not recoverable for a corporation. (*Id.* at 21-22).

Port Royal responds that Landmark has presented no evidence to support the position that this is merely a bona fide coverage dispute. (D.E. 198 at 7-8). Port Royal contends that the fact that Landmark relied on an expert report does not foreclose a bad faith claim. (*Id.* at 9-10). As to the common law duty of good faith and fair dealing, Port Royal asserts that the evidence shows that it took Landmark 10 months to even hire engineers or building damage consultants to investigate the damage, which was not timely or reasonable, and that the payment of $9,000,000 does not establish good faith where the actual damage was much higher. (*Id.* at 11-12). As to its Chapter 541 claims, Port Royal argues that Landmark clearly denied its claims given that Landmark filed this lawsuit to avoid paying more, and that the complaint includes several factual allegations regarding Landmark's bad faith. (*Id.* at 13-18). Port Royal argues that its counterclaims meet the pleading standard because they allege specific facts regarding how Landmark acted in bad faith. (*Id.* at 18-19). As to the DTPA claims, Port Royal argues that it has properly alleged

that it relied to its detriment on Landmark's bad faith conduct.  (*Id.* at 20-21).  As to the Prompt Payment Act claims, Port Royal contends that Landmark has only addressed the first four requirements, but that there are other requirements as well.  (*Id.* at 21-25).  Lastly, Port Royal agrees that it cannot receive mental anguish damages.  (*Id.* at 25).

Landmark first replies that Port Royal has provided to evidence that Alvarez failed to properly investigate the loss or that Landmark denied Port Royal's claim based on a report by Alvarez.  (D.E. 207 at 2-4).  Landmark notes that it had the benefit of TWIA's engineers and building consultants from the beginning of the investigation.  (*Id.* at 5-8).  Landmark argues that Port Royal has never provided any evidence of how much it actually cost to repair Buildings 3 and 6, so it cannot show bad faith where Landmark paid $9,000,000.  (*Id.* at 8-10).  Landmark denies that Port Royal has shown evidence of any misrepresentations, contending that the record shows that Landmark investigated the claim and that Port Royal was not a party to any of the communications it cites as misrepresentations.  (*Id.* at 10-14).  Finally, Landmark reiterates that there is no evidence that it violated the DTPA or Prompt Payment Act.  (*Id.* at 14-16).

a.   *Relevant Summary Judgment Evidence*

In an August 28, 2017, e-mail, Carlisle gave Port Royal's contact information to Alvarez and indicated that Alvarez would be the claims adjuster and would be at the property in two days.  (D.E. 145-44 at 1).  In an August 29, 2017, e-mail, Landmark's claims specialist told Alvarez to engage Williams as an accountant.  (D.E. 145-45 at 1).

Alvarez's invoice to Landmark showed that he was assigned the file on August 28, 2017, and inspected the property two days later.  (D.E. 145-51 at 1).  The invoice indicates

that Alvarez regularly spoke with TWIA's adjuster and requested building consultant information, the status of the property damage, and expert reports, among other things. (*Id.* at 2, 4-13). He also met with TWIA's building consultant and made several additional visits to the property. (*Id.*).

On September 2, 2017, Alvarez sent Landmark his initial advice regarding the claim, including his opinion that the property damage would not reach the policy's deductible, but that there was a likely a $4,000,000 business income loss. (D.E. 145-3 at 1-4).

On September 6, 2017, Williams requested information from Port Royal that would be relevant to the business income claim. (D.E. 145-52 at 1-3).

On September 24, 2017, Alvarez recommended that a $500,000 advance payment be sent to Port Royal. (D.E. 145-47 at 1). On September 25, 2017, Landmark sent Port Royal a $500,000 advance payment for loss of income. (D.E. 145-48 at 1).

In a March 16, 2018, e-mail, Alvarez told Williams that the policy only covered business income loss for Buildings 2, 3, and 6. (D.E. 189-14 at 2). However, in his deposition, Williams testified that his final report included all buildings because he was informed to make that change. (D.E. 206-4 at 4-5).

In an October 16, 2017, e-mail, Alvarez acknowledged Port Royal's September 25, 2017, request for an additional business income loss advance. (D.E. 145-53 at 1). He also indicated that he was working with TWIA's adjuster to get a better understanding of measured building loss, and he requested more information related to that issue. (*Id.*).

In a June 11, 2018, e-mail to TWIA, Alvarez indicated that he had not received Marshall's reports because Marshall would not provide them before TWIA approved it. (D.E. 189-19 at 1). He also noted that he understood that TWIA as wrapping up their adjustment of the loss and that Port Royal would soon have a claim for Landmark. (*Id.*).

In a June 15, 2018, e-mail, Alvarez indicated that Landmark wanted to engage DBI as a building consultant. (D.E. 189-1 at 2). He noted that he had previously worked with TWIA's building consultant, Marshall. (*Id.*).

On November 21, 2018, Lamont sent a copy of Port Royal's proof of loss to Alvarez. (D.E. 145-37 at 1-3). On December 6, 2018, Alvarez responded to Lamont and acknowledged the proof of loss. (D.E. 145-6 at 2). He also indicated that Landmark rejected the proof of loss for several reasons, including that Landmark had not received all of the information they had requested from Port Royal, including various reports relied on in the proof of loss. (*Id.* at 3).

In his March 2021 deposition, Alvarez testified to the following. (D.E. 206-1). Landmark hired many people to investigate and adjust the claim, including Marshall, BSC Engineering, and others. (*Id.* at 3-4). Although Marshall's work was billed to TWIA, Alvarez had continuous contact with him in the measurement of the loss. (*Id.* at 6).

In his April 2021 deposition, Marshall testified to the following. (D.E. 206-3). Alvarez contacted him early on in the project. (*Id.* at 5). TWIA and Landmark shared his work, which was not uncommon. (*Id.* at 6). He freely shared general knowledge with both TWIA and Landmark. (*Id.*). He and Alvarez did not exchange many e-mails, but they exchanged information over the phone because it was faster. (*Id.* at 7).

68

In his July 2021 deposition, Buffo testified to the following.   (D.E. 189-2). Landmark did not hire a building consultant until June 2018 because they initially retained Marshall.   (*Id.* at 6[24]).   However, when they received Marshall's reports, there was a major discrepancy between Marshall's estimates and the repair estimates from Port Royal. (*Id.* at 6-7[24-25]).

b.   *Applicable Law*

"[A]n insurer breaches its duty [of good faith and fair dealing] when the insurer fails to settle a claim if the insurer knew or should have known that it was reasonably clear that the claim was covered."   *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997). Evidence that shows only a bona fide coverage dispute does not establish bad faith.   *Id.* However, an insurer also cannot avoid a bad faith claim solely because it denied a claim based upon an expert report.   *Id.*   "[I]f there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable," then a claim of bad faith is still viable.   *Id.*   To support a claim of bad faith, "[t]he insured must prove that there were no facts before the insurer which, if believed, would justify denial of the claim." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997).   "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith."   *Id.*   "Conflicting expert opinions, by themselves, do not establish that the insurer acted unreasonably in relying on its own expert."   *Thompson v. Zurich Am. Ins. Co.*, 664 F.3d 62, 67 (5th Cir. 2011).

Under Texas law, it is an unfair or deceptive act in the business of insurance to: (1) misrepresent to a claimant a material fact or policy provision relating to coverage; (2) fail to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim where the insurer's liability is reasonably clear; (3) fail to promptly provide the insured with a reasonable explanation under the policy why a claim was denied; (4) fail to affirm or deny coverage of a claim to an insured; and (5) refuse to pay a claim without conducting a reasonable investigation of the claim, among other reasons. Tex. Ins. Code § 541.060(a). It is also an unfair or deceptive act in the business of insurance to make a statement misrepresenting the terms of a policy or the benefits or advantage promised by the policy. Tex. Ins. Code § 541.051(1). It is also an unfair or deceptive act in the business of insurance to misrepresent an insurance policy to make an untrue statement of material fact, fail to state a material fact necessary to make other statements not misleading, or make a material misstatement of law, among other things. Tex. Ins. Code § 541.061.

"[C]auses of action against insurers for bad faith under the DTPA and the Insurance Code require the same predicate for recovery as common law claims." *Henry v. Mut. of Omaha Ins. Co.*, 503 F.3d 425, 429 (5th Cir. 2007) (internal quotation marks omitted). Thus, when an insured raises a common law bad faith claim along with claims under the Texas Insurance Code and the DTPA, if there is no merit to the bad faith claim, then the statutory claims also fail. *Nat'l Sec. Fire & Cas. Co. v. Hurst*, 523 S.W.3d 840, 848 (Tex. App. 2017).

Not later than the 30th business day after a surplus lines insurer receives notice of a claim, the insurer must: (1) acknowledge receipt of the claim; (2) commence any

70

investigation of the claim; and (3) request from the claimant all items, statements, and forms that the insurer reasonably believes will be required.  Tex. Ins. Code § 542.055. These deadlines are extended an additional 15 days in the event of a weather-related catastrophe.  Tex. Ins. Code § 542.059.  "[A]n insurer shall notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss."  Tex. Ins. Code § 542.056(a).

An insurer may use an investigation done by another party as part of their investigation.  *Pioneer Chlor Alkali Co. v. Royal Indem. Co.*, 879 S.W.2d 920, 941 (Tex. App. 1994).

### c.   Analysis

Here, Port Royal has not shown that there is a genuine issue of material fact regarding whether Landmark acted in bad faith in partially denying their claim.  Instead, the summary judgment evidence indicates that this is a bona fide coverage dispute. Because the standard for common law claims and claims under the Texas Insurance Code is the same, they will be addressed together.  *Henry*, 503 F.3d at 429.  To establish bad faith, Port Royal focuses on the fact that Landmark did not hire engineers or building consultants for 10 months.  (D.E. 198 at 11-12).  However, this argument is misleading at best.  The evidence shows that Landmark utilized TWIA's experts at the beginning of their investigation and that Alvarez and these experts, including Marshall, were regularly in contact during this time.  (D.E. 145-51 at 2, 4-13; D.E. 206-1 at 3-4, 6; D.E. 206-3 at 5-7). Landmark then hired its own experts when TWIA completed its adjustment of Port Royal's

claims and once it discovered that Marshall's estimates vastly different from Port Royal's. (D.E. 189-2 at 6-7[24-25]; D.E. 189-19 at 1). There was nothing wrong with this course of action because an insurer may utilize an investigation done by another party as part of their investigation. *Pioneer Chlor*, 879 S.W.2d at 941. Moreover, in order to show bad faith, Port Royal must show that there "were no facts before the insurer which, if believed, would justify denial of the claim." *Higginbotham*, 103 F.3d at 459. Port Royal has not established a genuine issue of material fact on this issue. Alvarez explained why Landmark rejected Port Royal's proof of loss and explained the additional information Landmark needed. (D.E. 145-6 at 3-4). Further, the summary judgment evidence discussed in detail above shows a bona fide dispute regarding the amount of preexisting damage at the property and how much of the claimed loss is actually covered under the policy. Port Royal's failure to show a genuine issue of material fact on its bad faith claim also means that its statutory bad faith claims under the Texas Insurance Code and DTPA fail. *Hurst*, 523 S.W.3d at 848.

Further, Port Royal has not shown that there is a genuine issue of material fact regarding its claim under the Prompt Payment Act. First, as to any claim under § 542.055, Landmark had 45 days to acknowledge receipt of the claim, commence an investigation, and request from the claimant all items, statements, and forms that the insurer reasonably believes will be required. Tex. Ins. Code §§ 542.055, 542.049. Carlisle indicated that he received notice of Port Royal's claim on August 27, 2017, and faxed it to Landmark. (D.E. 189-16 at 2). Alvarez was assigned the case the next day, and was on-site by August 30, 2017. (D.E. 145-44 at 1; D.E. 145-51 at 1). There was no delay in Landmark's

acknowledgment of the claim or investigation.  The evidence also shows, as discussed above, that Alvarez worked with Marshall and TWIA until TWIA's adjustment process was completed.  (D.E. 145-51 at 2, 4-13; D.E. 206-1 at 3-4, 6; D.E. 206-3 at 5-7).  Landmark was entitled to use TWIA's consultants and adjusters to conduct its investigation.  *Pioneer Chlor*, 879 S.W.2d at 941.  As to a claim under § 542.056(a), Lamont sent the proof of loss on November 21, 2018.  (D.E. 145-37 at 1-3).  Alvarez then notified him, in writing, on December 6, 2018, that Landmark was rejecting the proof of loss and explained why.  (D.E. 145-6 at 3).  This was well within the time limit of 15 business days.  Tex. Ins. Code § 542.056(a).

Finally, Port Royal agrees that it cannot obtain mental anguish damages.  Accordingly, it is recommended that Landmark's motion for summary judgment on Port Royal's extracontractual counterclaims (D.E. 149) be **GRANTED** and that Port Royal's extracontractual counterclaims be **DISMISSED**.

## IX.  RECOMMENDATION

Accordingly, it is recommended that: (1) Landmark's motion to strike (D.E. 208) be **GRANTED in part and DENIED in part**; (2) Port Royal's motion for partial summary judgment (D.E. 143) be **DENIED**; (3) Landmark's motion for summary judgment on Port Royal's failure to allocate (D.E. 146) be **DENIED**; (4) Landmark's motion for summary judgment on Port Royal's Building 2 claims (D.E. 147) be **GRANTED**; (5) Landmark's motion for summary judgment on Port Royal's business income claims (D.E. 148) be **GRANTED**; and (6) Landmark's motion for summary judgment on Port Royal's extracontractual claims (D.E. 149) be **GRANTED**.

Respectfully submitted on March 26, 2022.

_____
Julie K. Hampton
United States Magistrate Judge

## **NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).